897 A.2d 1034

GARY A. PUCKREIN, ADMINISTRATOR OF THE ESTATES OF KEVIN H. PUCKREIN, DECEASED, AND ALECIA PUCKREIN, DECEASED, AND JEAN GREAVES AND CECIL GREAVES, H/W, PLAINTIFFS–APPELLANTS, v. ATI TRANSPORT, INC., GAIZKA IDOETA, JOHN R. STANGLE, JR., WORLD CARTING CORP., KRISTEN STANGLE, A/K/A KRISTEN GOSDICK, COVENANT DISPOSAL, INC., BURKEEN CONSTRUCTION CO., BULK TRANS EXPRESS CO., INC., BFI RECYCLING SYSTEMS, BFI RECYCLING OF NEW JERSEY, INC., FORMERLY BROWNING–FERRIS INDUSTRIES WASTE SYSTEMS, INC., BROWNING–FERRIS INDUSTRIES WASTE SYSTEMS, INC., BFI WASTE SYSTEMS OF NEW JERSEY, INC., BFI WASTE SYSTEMS OF NORTH AMERICA, INC., AMERICAN REF– FUEL CONSTRUCTION OF ESSEX COUNTY, INC., A/K/A AMERICAN REF–FUEL COMPANY, JOE FABLE, "JOHN DOE" HUMPHREY, JIM VAN WOERT, JEFF RANDAZZO AND RICK DEANDRE, JOHN DOE TRUCKING, 1–10, AND JOHN DOE MOTOR CARRIER, 1–10, DEFENDANTS, AND ALLIED WASTE INDUSTRIES, INC., SUCCESSOR IN INTEREST TO BROWNING–FERRIS INDUSTRIES OF NEW YORK, INC. A/K/A BFI OF NEW YORK, INC., DEFENDANT–RESPONDENT.

Argued October 11, 2005—Decided May 22, 2006.

*Paul D. Brandes* argued the cause for appellants (*Villari, Brandes & Kline,* attorneys; *Mr. Brandes* and *Theresa L. Giannone,* on the briefs).

*Christopher C. Mauro* argued the cause for respondent (*Camacho Mauro Mulholland,* attorneys).

Justice LONG delivered the opinion of the Court.

In 1998, Kevin and Alecia Puckrein were killed when their automobile was struck by an unregistered and uninsured tractor-trailer with seriously defective brakes. The tractor-trailer was owned by ATI Transport, Inc., (ATI) and, at the time of the accident, had been transporting a load of glass residue for Browning–Ferris Industries of New York, Inc., (BFI–NY) from Brooklyn, New York, to an incinerator plant in Newark, New Jersey. BFI–NY actually had contracted with World Carting Corp., to transport the load and World Carting, in turn, had assigned its responsibilities to ATI.

Plaintiffs sued a series of defendants including Gaizka Idoeta (the driver of the tractor-trailer), ATI, World Carting, John Stangle (the owner of ATI and World Carting), and BFI–NY. The trial judge dismissed the case against BFI–NY on summary judgment. Plaintiffs prevailed at trial but all defendants were, by then, judgment proof.

The issue before us is the propriety of the grant of summary judgment in BFI–NY's favor. Plaintiffs argue that BFI–NY had a duty to ensure the safety of the trucks it used under federal statutory and regulatory provisions relevant to interstate motor carriers and under common-law negligence principles applicable to the hiring of incompetent independent contractors.

Because the facts in this case, viewed in the light most favorable to plaintiffs, did not warrant the grant of summary judgment in BFI–NY's favor on the issue of the hiring of an incompetent contractor, we now reverse that judgment.

## I

### THE ACCIDENT

On June 22, 1998, the Puckreins were killed and Alecia Puckrein's mother, Jean Graeves, was seriously injured when a tractor-trailer with faulty brakes went through a red light on Rock Avenue in North Plainfield and struck the automobile in which they were riding. At the time, the tractor-trailer contained glass residue produced in the glass-crushing process and had a gross weight of 79,000 pounds. Idoeta had picked up the residue at BFI–NY's Brooklyn site and transported it to American Ref–Fuel in Newark. Because the hydraulic system on the truck was not operating, he could not drop off the load and was asked to leave. Idoeta was on his way back to ATI when the accident occurred. An automotive engineer retained by the State Police determined that at the time of the accident, a "maximum of 54 percent of the required braking existed" on the truck. According to a police report, the truck had markings identifying it as "ATI Transport."

Idoeta was issued summonses for reckless driving, *N.J.S.A.* 39:4–96; failure to observe a traffic signal, *N.J.S.A.* 39:4–81; operation of an unsafe vehicle, *N.J.S.A.* 39:3–44; and operation of an uninsured vehicle, *N.J.S.A.* 39:6b–2. ATI, as the owner of the tractor-trailer, received summonses for allowing operation of a vehicle with a suspended registration, *N.J.S.A.* 39:3–40; allowing operation of an unsafe vehicle, *N.J.S.A.* 39:3–44; and allowing operation of an uninsured vehicle, *N.J.S.A.* 39:6b–2. Idoeta was also charged with manslaughter, of which he was acquitted.

Stangle was charged with manslaughter as well. After the trial resulted in a hung jury, Stangle pled guilty to fourth-degree creating a risk of widespread injury or damage, *N.J.S.A.* 2C:17–2,

and to motor vehicle offenses of suspended registration, *N.J.S.A.*
39:3–40; unsafe vehicle, *N.J.S.A.* 39:3–44; and uninsured vehicle,
*N.J.S.A.* 39:6b–2. In entering the pleas to the charges, Stangle
admitted he knew that at least one of the brake drums on the
truck that killed the Puckreins was completely missing and that, in
sending the truck out onto the road, he consciously disregarded
the risk of injury, making him reckless. He also acknowledged
that the truck had neither registration nor insurance on the day of
the accident.

## THE PARTIES

In June 1998, BFI–NY was one of Browning–Ferris Industries'
nearly 200 North American wholly-owned subsidiaries.[1] BFI–NY
used a facility at 72 Scott Avenue in Brooklyn as "a central hub
for the five boroughs of New York City." Pursuant to two con-
tracts with the City of New York (the City), BFI–NY collected
and hauled the City residents' waste and recyclable materials to
Brooklyn. The facility also accepted solid waste collected by its
own trucks in Brooklyn, Queens, Manhattan, and the Bronx, as
well as waste independent haulers paid to leave at the site. From
the Brooklyn facility, BFI–NY shipped recyclables to "[t]he 50
states and around the world" and solid waste to "Ohio, Pennsylva-
nia, New Jersey, and Long Island ... and in some cases, Virgi-
nia."

BFI–NY used independent carriers to transport recyclables and
solid waste across state lines. Further, BFI–NY purchased
trucks and registered them to BFI–NJ, an affiliate and a regis-
tered federal motor carrier, to transport waste from Brooklyn to
American Ref–Fuel in Newark. Dennis Pantano, President of
BFI–NY in June 1998, explained that BFI–NJ trucks were owned
by BFI–NY and that the "paper transaction" with BFI–NJ was
done for the benefit of BFI–NY because of New Jersey environ-

---

[1] In 1999, Allied Waste acquired BFI, making it the second largest solid waste
company in the nation.

mental permit requirements. At the time of the accident, BFI–NY was not registered as a federal motor carrier.

In July 1997, BFI–NY contracted with World Carting to haul glass residue to Morgantown, Pennsylvania, and American Ref–Fuel in Newark, and if no glass residue was available, to haul solid waste to American Ref–Fuel. Pursuant to the contract, World Carting was to provide necessary "services and equipment" with the equipment "comply[ing] with all applicable federal, state and local laws, rules, regulations, permits and licenses." Additionally, World Carting "warrant[ed] that it [had] all federal, state or local permits and licenses required to perform the work." World Carting was to perform the work as an independent contractor, "in compliance with all applicable statutes and regulations, including, without limitation, the rules and regulations of the Environmental Protection Agency, Department of Transportation and the Occupational Safety and Health Administration, and any similar federal, state or local law or regulations applicable." World Carting also agreed to maintain required insurance and to furnish BFI–NY with proof of insurance, as well as to indemnify BFI–NY for "injuries to or death of persons … caused by, resulting from, growing out of, or incidental to the work performed under [the] Agreement." Finally, the contract stipulated that World Carting was not to subcontract the work without prior written approval from BFI–NY.

Jeff Randazzo, Transportation Manager of BFI–NY, "oversaw all of the material going outbound from the facility." He indicated that a relationship formed between BFI–NY and World Carting after BFI–NY's operations manager, John Puma, recommended Stangle. Randazzo provided Stangle, whom he believed owned "two trucks," with the contract.

Randazzo testified that he received Stangle's certificate of insurance from Puma. According to documentation BFI–NY provided to investigating officers in June 1998, World Carting's liability insurance expired on April 15, 1998, two months before the

accident, and BFI–NY had no updated information on file indicating that the insurance had been renewed.

Despite BFI–NY's contract with World Carting, Randazzo testified that ATI trucks "show[ed] up for World Carting," leading him to believe that "they were the same company." In fact, World Carting and ATI had the same address and leadership. World Carting listed 401 Ferncrest Court, Three Bridges, New Jersey as its address in its contract with BFI–NY. The same address was also listed for ATI on the registration of the truck involved in the accident. Furthermore, Stangle served as president and owner of both World Carting and ATI, and his wife, Kristen Stangle, served as general manager for World Carting. Randazzo explained that the invoices for loads hauled by ATI said "either ... World Carting or ATI," he could not remember which, but he "believe[d] they were World Carting" and "[he] thought all the payments were issued to World Carting."

The procedures for admittance to the BFI–NY facility are unclear. Alfred Dibens, who worked on "safety and health and environmental issues" for BFI–NY, indicated that for ATI to haul on behalf of World Carting, either "[t]hey would just show up and say 'I'm hauling for World Carting' " or World Carting would call to inform BFI–NY. Jim Van Woert, who was responsible for BFI–NY's health and safety in June 1998, noted however, that a truck needed clearance before it entered the BFI–NY facility because BFI–NY "would not allow just anybody to come off the street. They [the trucks] would have to have some sort of agreement with BFI."

Although Randazzo said that in order to haul for BFI–NY, a hauler had to have an inspected and registered tractor and trailer along with insurance, he acknowledged that nobody at BFI–NY checked to determine if ATI's registration, insurance, and other licenses were in order. BFI–NY just "assumed" the hauler had what was "needed." Further, according to several BFI–NY employees, it was the hauler, not BFI–NY, who was responsible to ensure compliance with federal regulations.

The record contains only one agreement between World Carting and ATI. At 12:01 a.m. on June 20, 1998, World Carting leased the truck involved in the accident (identified as tractor number 106) from ATI for sixty-five percent of gross revenue, not including driver services. According to the agreement, World Carting was to provide property and liability insurance. No mention of the BFI–NY/World Carting agreement is contained in the lease that bears only the lessee's signature, that of Stangle. World Carting did not obtain permission from BFI–NY for the arrangement.

## PROCEDURAL HISTORY

On May 26, 2000, plaintiff Gary A. Puckrein, as administrator of the estates of Kevin H. and Alecia Puckrein, as well as plaintiffs Jean and Cecil Greaves, sued twenty-two defendants for the wrongful deaths of Kevin and Alecia, personal injury and negligent infliction of emotional distress sustained by Jean Greaves, loss of consortium suffered by Jean's husband Cecil Greaves, and punitive damages.[2] Idoeta, John and Kristen Stangle, ATI, and World Carting defaulted. Plaintiffs filed a motion for partial summary judgment on liability and causation against Idoeta, Stangle, ATI, and BFI–NY as well as the other BFI entities.

BFI–NY opposed plaintiffs' motion and cross-moved for summary judgment. Specifically, BFI–NY contended that plaintiffs had not proven that BFI–NY was negligent or that Idoeta was a statutory employee of BFI–NY. Thus, according to BFI–NY, it was not responsible for his actions. The trial judge denied

---

[2] The defendants included ATI Transport, Inc., Gaizka Idoeta, John R. Stangle, Jr., World Carting Corp., Kristen Stangle, Covenant Disposal, Inc., Burkeen Construction Co., Bulk Trans Express Co., Inc., BFI Recycling Systems, BFI Recycling of New Jersey, Inc., Browning–Ferris Industries Waste Systems, Inc., Browning–Ferris Industries of New York, Inc., BFI Waste Systems of New Jersey, Inc., BFI Waste Systems of North America, Inc., American Ref–Fuel Construction of Essex County, Inc., Joe Fable, John Doe Humphrey, Jim Van Woert, Jeff Randazzo, Rick Deandre, John Doe Trucking 1–10, and John Doe Motor Carrier 1–10.

plaintiffs' motion for summary judgment, and granted summary judgment in favor of BFI–NY as well as all "BFI-related entities."

In 2003, pursuant to *Rule* 4:37–2(e), BFI–NY successfully moved for continued participation in the pending damages trial against the remaining defendants who were judgment proof and would not be appearing. Following the trial, the jury returned verdicts against Idoeta, John and Kristen Stangle, ATI, and World Carting. The estate of Kevin Puckrein was awarded $424,624.50, the estate of Alecia Puckrein $119,613, and Jean Greaves $175,000. The jury also awarded one million dollars in punitive damages against Stangle.

Plaintiffs appealed from the grant of summary judgment in favor of BFI–NY and the Appellate Division affirmed. In doing so, the court rejected plaintiffs' claims that (1) BFI–NY was ATI's statutory employer; (2) BFI–NY was liable for ATI's negligence; or (3) plaintiffs were third party beneficiaries of the contract between BFI–NY and the City. We granted certification. 183 *N.J.* 257, 872 *A.*2d 799 (2005).

## II

Plaintiffs argue that BFI–NY qualified as a motor carrier under 49 *U.S.C.A.* § 13102(14) and was thus vicariously liable for the negligence of World Carting and ATI; that BFI–NY hired an "incompetent" contractor for whose acts it was responsible; and that our "strong public policy" in favor of highway safety devolved a non-delegable duty on BFI–NY to assure that its waste and recyclables were safely transported on the highways.[3]

BFI–NY counters that it was not a registered motor carrier under federal safety regulations and, therefore, did not qualify as a statutory employer of ATI; that it was not liable for ATI's actions because it did not contract with ATI but only with World

---

[3] Here, plaintiffs have not pressed the third-party beneficiary theory advanced in the Appellate Division.

Carting; that even if it had contracted with ATI it was insulated from liability because ATI was an independent contractor; and that it was not liable for hiring an "incompetent" independent contractor under *Mavrikidis v. Petullo*, 153 *N.J.* 117, 147, 707 *A.*2d 977 (1998).

### III

We turn first to plaintiffs' incompetent contractor claim. It is well-settled that when a person engages an independent contractor to do work that is not itself a nuisance, he is not vicariously liable for the negligent acts of the contractor in the performance of the contract. *Bahrle v. Exxon Corp.*, 145 *N.J.* 144, 156, 678 *A.*2d 225 (1996) ("Ordinarily, an employer that hires an independent contractor is not liable for the negligent acts of the contractor in the performance of the contract."); *Baldasarre v. Butler*, 132 *N.J.* 278, 291, 625 *A.*2d 458 (1993) ("Generally . . . the principal is not vicariously liable for the torts of the independent contractor if the principal did not direct or participate in them."). The immunity of the principal who hires an independent contractor rests on the distinction between such a contractor and an employee.

> The important difference between an employee and an independent contractor is that one who hires an independent contractor
>
> > has no right of control over the manner in which the work is to be done, it is to be regarded as the contractor's own enterprise, and he, rather than the employer is the proper party to be charged with the responsibility for preventing the risk, and administering and distributing it.
>
> [*Baldasarre, supra*, 132 *N.J.* at 291, 625 *A.*2d 458 (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 71 (5th ed.1984)).]

There are, however, three exceptions to the general rule that principals are not liable for the actions of independent contractors: (1) where the principal retains control of the manner and means of doing the work subject to the contract; (2) where the principal engages an incompetent contractor; or (3) where the activity constitutes a nuisance per se. *Majestic Realty Assocs. v. Toti Contracting Co.*, 30 *N.J.* 425, 431, 153 *A.*2d 321 (1959). In this case, BFI–NY is not alleged to have maintained control over

the transportation of its goods by World Carting. Further, trucking is neither a nuisance per se nor has it been held to be an inherently dangerous activity requiring special precautions, thus warranting the imposition of a non-delegable duty on the principal to assure the safe transport of its goods on the public highways. *Mavrikidis, supra,* 153 *N.J.* 117, 147, 707 *A.*2d 977 (holding transport of asphalt not inherently dangerous); *see also Eastern Airlines v. Joseph Guida & Sons Trucking Co.,* 675 *F.Supp.* 1391 (E.D.N.Y.1987) (hauling material by truck not inherently dangerous activity); *Morales v. Davis Bros. Constr. Co.,* 647 *So.*2d 1302 (La.Ct.App.1994) (same); *Kime v. Hobbs,* 252 *Neb.* 407, 562 *N.W.*2d 705 (1997) (same); *Norris v. Bryant,* 217 *S.C.* 389, 60 *S.E.*2d 844 (1950) (same); *King v. Lens Creek Ltd. P'ship,* 199 *W.Va.* 136, 483 *S.E.*2d 265 (1996) (same). Thus, only the second exception—the incompetent contractor exception—is at issue here.

## A.

 The notion of liability for hiring an incompetent contractor is derived from basic negligence principles. The *Restatement (Second) of Torts* Section 411 (1965) states:

> An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor (a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or (b) to perform any duty which the employer owes to third persons.

Comment a to Section 411, in turn, defines a competent and careful contractor as "a contractor who possesses the knowledge, skill, experience, and available equipment which a reasonable man would realize that a contractor must have in order to do the work which he is employed to do without creating unreasonable risk of injury to others." Comment b to Section 411 further explains:

> The employer of a negligently selected contractor is subject to liability under the rule stated in this Section for physical harm caused by his failure to exercise reasonable care to select a competent and careful contractor, but only for such physical harm as is so caused. In order that the employer may be subject to liability it is, therefore, necessary that harm shall result from some quality in the contractor which made it negligent for the employer to entrust the work to him.

■ In other words, to prevail against the principal for hiring an incompetent contractor, a plaintiff must show that the contractor was, in fact, incompetent or unskilled to perform the job for which he/she was hired, that the harm that resulted arose out of that incompetence, and that the principal knew or should have known of the incompetence. *Mavrikidis, supra,* 153 *N.J.* at 136–37, 707 *A.*2d 977.

## B.

*Mavrikidis, supra,* 153 *N.J.* 117, 707 *A.*2d 977, is our most recent foray into the incompetence exception. There, the owner of Clar Pine Servicenter (Clar Pine) hired an independent contractor to replace the asphalt at his premises. *Id.* at 125, 707 *A.*2d 977. A dump truck belonging to the contractor and overloaded with hot asphalt that was being transported to the job site collided with the plaintiff's car, injuring her. *Id.* at 124–25, 707 *A.*2d 977.

Plaintiff sued the Petullos, who were the contractors hired to replace the asphalt and also the owners of the truck; the company responsible for loading the asphalt onto the truck; and Clar Pine. *Id.* at 129, 707 *A.*2d 977. A jury found that Clar Pine was "negligent in engaging a careless, reckless or incompetent contractor" and that its negligence was a proximate cause of the accident and the plaintiff's injuries. *Id.* at 130, 707 *A.*2d 977. The Appellate Division reversed, finding that there was insufficient evidence to support a finding that Clar Pine was negligent in hiring the Petullos. *Id.* at 130–31, 707 *A.*2d 977. This Court considered whether Clar Pine should be vicariously liable for the negligence of the Petullos or for hiring an incompetent contractor and condensed both inquiries stating: "Because the second *Majestic* prong may include causes of action for both direct and vicarious liability, there is no reason to set out a separate tort for negligently hiring an independent contractor." *Id.* at 137, 707 *A.*2d 977.

In *Mavrikidis,* a majority of this Court ruled in favor of immunizing Clar Pine. *Id.* at 148, 707 *A.*2d 977. First, the Court held that there was no evidence that the Petullos were incompe-

tent to perform the work for which they were hired—"paving the service station." *Id.* at 137, 707 *A.*2d 977. In that respect, the Court explicitly determined that neither the risks of driving the asphalt truck nor its overloading were "inherent" in the contracted paving work. *Id.* at 147, 707 *A.*2d 977. Second, the Court held that even if the Petullos were incompetent, the principal had no reason to know of it. *Id.* at 138, 707 *A.*2d 977. In that regard, the Court found that the Petullos' financial irresponsibility and the poor condition of its trucks were not evidence of incompetency to pave. *Id.* at 138–42, 707 *A.*2d 977. In describing the subject of the contract, the Court noted that most independent contractors transport their equipment and supplies to the job site, and that the principal should not be required to inquire about peripheral issues such as the contractor's mode of transportation or be liable for accidents that occur en route to the premises. *Id.* at 142, 707 *A.*2d 977.

The dissent in *Mavrikidis* viewed the majority opinion as too limited an application of the *Majestic* incompetency exception. *See id.* at 152–60, 707 *A.*2d 977 (Stein, J., dissenting). In particular, the dissent found substantial evidence in the record to support the jury's finding that Clar Pine was negligent in hiring the Petullos "to pave *and transport* hot asphalt to the job site," *id.* at 154, 707 *A.*2d 977 (emphasis added), including that Clar Pine hired the Petullos because they owed it money; that the owner of Clar Pine described the Petullos' trucks as "junks"; and that the owner of Clar Pine acknowledged that the trucks were not inspected. *Id.* at 154–58, 707 *A.*2d 977.

At the heart of *Mavrikidis* was a difference of opinion over whether to consider that contract narrowly as a paving contract, or more broadly as including pre- and post-paving activities. Although that issue may be debatable, what is not debatable is that the tipping point between the majority and the dissent in *Mavrikidis* was not a disagreement over the basic legal principles to which we have adverted. That is the backdrop for our inquiry.

### C.

BFI–NY argues that, even assuming it was aware that World Carting's trucks were uninsured and unregistered (and therefore uninspected), *Mavrikidis* insulates it from liability because that case held that insurance, registration, and poor financial condition are not competency issues. That reading of *Mavrikidis* is incorrect. *Mavrikidis* essentially held that Clar Pine hired a subcontractor to pave; that the plaintiff was not injured during a badly executed paving job; that the transport of equipment and products to the job site was peripheral to the paving function; and that there was no evidence from which Clar Pine should have concluded that the Petullos were incompetent to pave.

By contrast, the very job that BFI–NY hired World Carting/ATI to do was to haul waste and recyclables across state lines. Unlike *Mavrikidis*, transportation was not peripheral to the BFI–NY/World Carting contract, it was the contract. Had that been the case in *Mavrikidis*, we have no doubt that the result would have been different. Clearly, under our law, the hauler's basic competency included, at a minimum, a valid driver's license, a valid registration certificate, and a valid liability insurance identification card. *N.J.S.A.* 39:3–29. Without those, the hauler has no right to be on the road at all. *Ibid.* BFI–NY's own witnesses agreed with that conclusion.

■ The allegations in this case strike at the heart of the competency issue in a trucking case. Unlike the claims in *Mavrikidis*, licensing, registration, and insurance are, under our law, the *sine qua non* to the transport of goods on the roadways.[4] *N.J.S.A.* 39:3–29. Registration, concomitant to inspection,[5] is a

---

[4] Under New Jersey law, "[e]very owner or registered owner of a motor vehicle registered or principally garaged in this State shall maintain motor vehicle liability insurance coverage...." *N.J.S.A.* 39:6B–1. Commercial motor vehicles also have their own specific registration requirements. *See N.J.S.A.* 39:3–20.

[5] Under New Jersey law, "[e]very motor vehicle *registered* in this State which is used over any public road, street, or highway or any public or quasi-public

method of insuring the safety of vehicles that place the public at risk and insurance is the guarantee that innocent victims of errant truckers will be compensated. Thus, the core question here is not whether World Carting was competent to transport BFI–NY's loads upon the public highways—it was not. The question is whether BFI–NY violated its duty to use reasonable care in selecting a trucker and whether it knew or should have known of World Carting's incompetence.

■ We return to the principles relevant to the duty of inquiry. As noted, "an employer may be charged with negligence in hiring an independent contractor where it is demonstrated that he should have known, or might by the exercise of reasonable care have ascertained, that the contractor was not competent." Reuben I. Friedman, Annotation, *When is Employer Chargeable with Negligence in Hiring Careless, Reckless, or Incompetent Independent Contractor,* 78 *A.L.R.*3d 910, 916 (1977); *see also* J.D. Lee & Barry A. Lyndahl, *Modern Tort Law* § 8.03 (1991) ("An employer may be liable for the negligent acts of an independent contractor if the employer fails to exercise due care in the selection of a competent independent contractor."); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 71 (5th ed.1984) (same). The extent of the inquiry obviously depends on the status of the principal and the nature of the task that the contract covers. For example, as we explained in *Mavrikidis,* a principal who hires a contractor to paint or pave or install electrical outlets need not inquire whether its pick-up trucks are inspected and insured. Likewise, a casual shipper of goods has a right to assume that the carrier is not conducting business in violation of the law. On the contrary, a company whose core purpose is the collection and transportation of materials on the highways, has a duty to use reasonable care in the hiring of an independent trucker including a duty to make an inquiry into that trucker's ability to travel legally

---

property in this State" must be inspected at "official inspection facilities" or "licensed private inspection facilities." *N.J.S.A.* 39:8–1(a) (emphasis added).

on the highways. At a minimum, BFI–NY was required to inquire whether its haulers had proper insurance and registration because without those items the hauler had no right to be on the road. Just as BFI–NY itself could not have transported products in unregistered and uninsured trucks, it was not free to engage an independent contractor that did so.

Indeed, according to the record, BFI–NY imposed that duty of inquiry on its own employees. Randazzo testified that in order to haul for BFI–NY, a trucker had to have, "[a] registered truck and trailer," "[i]nsurance," and "inspection" from "whatever state they were from." Yet, on this record, there is no indication that anyone at BFI–NY inquired about World Cartings' ability to travel on the highways. Randazzo's testimony did not suggest otherwise:

> Q. What was your responsibility, if any, for determining whether the truck owner who was coming to you to be hired by BFI was, in fact, properly licensed by the necessary authorities to do that job?
>
> A. I had no responsibility for that. The trucker was responsible for that.
>
> Q. As part of your job did you ever investigate to determine whether a trucker owner seeking to haul material for BFI had all the necessary licenses and permits?
>
> A. No.
>
> Q. You did not consider that part of your job?
>
> A. *No. As them being the trucker we just assumed that they had the necessary, you know, registration or whatever they needed to haul the material.*
>
> . . . .
>
> Q. In order for the trucker to begin hauling for BFI, did you ever require that the trucker provide you with copies of whatever federal, state and local permits he or she had?
>
> A. No.

Accordingly, BFI–NY was not entitled to summary judgment on the incompetent contractor exception. At the very least, the reasonableness of its inquiry to World Carting was a jury issue.

Even if it could be proved that BFI–NY made reasonable inquiry of World Carting at the time of its original retention, its duty did not end there. *See* Friedman, *supra,* 78 *A.L.R.*3d at 920 (explaining that although originally unaware that contractor was incompetent, employer who acquires knowledge of incompetence

thereafter may be liable for inaction) (citing *Peck v. Woomack,* 65 *Nev.* 184, 192 *P.*2d 874 (1948); *Kuhn v. P.J. Carlin Const. Co.,* 154 *Misc.* 892, 278 *N.Y.S.* 635 (N.Y.Sup.Ct.1935), *aff'd,* 248 *A.D.* 582, 288 *N.Y.S.* 1110 (1936), *rev'd on other grounds,* 274 *N.Y.* 118, 8 *N.E.*2d 300 (1937)). By April 1998, World Carting's insurance certificate, on file with BFI–NY, had expired. Despite its continuing duty to inquire, BFI–NY never did so although it continued to allow World Carting's trucks to transport its glass residue. In other words, at a point after the original retention but before plaintiffs' accident, BFI–NY should have known that World Carting had become incompetent to transport its products. Yet, according to the record, BFI–NY continued to load World Carting and ATI trucks without evidence that they were competent to transport its products. Under the circumstances, summary judgment in BFI–NY's favor should not have been granted.

## D.

 We finally reject the contention that even if World Carting was incompetent, BFI–NY cannot be vicariously liable for the acts of ATI because "BFI–NY had no relationship whatsoever to ATI. BFI–NY contracted for services with World Carting only."

The question of BFI–NY's relationship with ATI could not have been decided in BFI–NY's favor on summary judgment. It is one for the trier of fact. BFI–NY hired World Carting, through its president, Stangle, to transport its glass residue to New Jersey. World Carting sent ATI trucks to do the transporting and they were filled by BFI–NY with no questions asked. The BFI–NY employee responsible for health and safety issues (Van Woert) testified at his deposition that for ATI to have made pickups, it "would have to have some sort of agreement with BFI." As far as the transportation manager for BFI–NY could recall, although ATI was doing the transporting, the invoices for the loads said "World Carting" and all payments were issued to "World Carting." Employees of BFI–NY testified that they thought World Carting and ATI were the same company. Indeed, World Carting

and ATI have the same address, Stangle was president and owner of both World Carting and ATI, and his wife, Kristen Stangle, served as general manager for World Carting.

Further, although World Carting agreed in its contract with BFI–NY that it would not subcontract the job to an "independent contractor" without BFI–NY's permission, according to the record, it neither sought nor obtained that permission to use the ATI truck, inferentially holding out ATI as its employee or alter-ego. Indeed, that seems to be the way BFI–NY's employees viewed those entities. That evidence, viewed in a light most favorable to plaintiffs, the non-moving parties, suggests that World Carting and ATI were one and the same, and that BFI–NY knew it and treated them as one entity. That alone justified a denial of BFI–NY's motion for summary judgment regarding whether it could be vicariously liable for the acts of ATI.

## IV

That ruling makes it unnecessary for us to address the closely poised issue of BFI–NY's status as a statutory employer under federal law. *In re Dart Transit Co.*, 9 *I.C.C.*2d 701 (1993); *Cox v. Bond Transp., Inc.*, 53 *N.J.* 186, 249 *A.*2d 579 (1969). For the reasons to which we have adverted, the judgment of the Appellate Division is reversed, plaintiffs' complaint against BFI–NY is reinstated, and the cause is remanded to the Law Division for further proceedings consistent with this opinion.

Chief Justice PORITZ and Justices LaVECCHIA, ZAZZALI, ALBIN, WALLACE, and RIVERA–SOTO join in Justice LONG's opinion.

*For reversal/reinstatement/remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.