**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0761-18T4

ESTATE OF KATHLEEN
CHETWYND by FREDERICK
E. CHETWYND, JR., the Executor
of the Estate of Kathleen Chetwynd,
FREDERICK E. CHETWYND, JR.,
her husband, individually, and
PETER CHETWYND,

     Plaintiffs-Appellants,

v.

DIVERSIFIED RACK & SHELVING,
INC., J.C. RACK & SHELVING, INC.,
JUAN CARLOS RODRIGUEZ,
JOSE AVALOS, SCHREIBER
FOODS INTERNATIONAL, INC.,
ALL SEASONS FOODS, INC.
d/b/a EVILY ATLANTIC
WAREHOUSE, LTD., EVILY
DISTRIBUTION, and HARLEYSVILLE
INSURANCE COMPANY,

     Defendants-Respondents.

_____

Submitted December 2, 2019 – Decided December 16, 2019

Before Judges Fasciale and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-0232-16.

Pezzano Mickey & Bornstein LLP, attorneys for appellants (Wendy S. Bornstein, on the briefs).

Law Office of Gerald F. Strachan, attorneys for respondent Diversified Rack & Shelving, Inc. (Matthew Raymond Panas, on the brief).

Barry, McTiernan & Wedinger, PC, attorneys for respondents Schreiber Foods International, Inc. and All Seasons Foods, Inc. d/b/a Evily Atlantic Warehouse, Ltd. a/k/a Evily Distribution (Laurel A. Wedinger and Richard W. Wedinger, on the brief).

PER CURIAM

In this personal injury case, plaintiffs appeal two April 2, 2018 orders, barring plaintiffs' liability expert report and granting summary judgment to defendants Diversified Rack & Shelving, Inc. (Diversified) and Schreiber Foods International, Inc.; All Seasons Foods, Inc. d/b/a Evily Atlantic Warehouse, Ltd. a/k/a Evily Distribution (collectively Schreiber). Kathleen Chetwynd (plaintiff) died during the unloading of heavy metal shelving from her truck. We affirm.

Schreiber owned the premises where the accident occurred. Schreiber hired Diversified to dismantle, transport and re-install storage racks. Diversified then hired plaintiff's company, Kat'z Transportation LLC, to transport the shelving, and hired J.C. Rack & Shelving, Inc. (J.C. Rack), which was owned

A-0761-18T4

by Juan Carlos Rodriguez (Rodriguez), to load and unload plaintiff's truck. The accident occurred when Jose Avalos (Avalos)—a J.C. Rack employee—unloaded plaintiff's truck using a forklift. Plaintiffs argued that Avalos operated the forklift without taking the necessary steps to ensure that no one was within the truck's vicinity.[1]

I.

We begin by addressing the order barring plaintiffs' expert report as a net opinion. The admission or exclusion of expert testimony is within the trial judge's sound discretion. State v. Berry, 140 N.J. 280, 293 (1995). "Absent a clear abuse of discretion, an appellate court will not interfere with the exercise of that discretion." Innes v. Marzano-Lesnevich, 435 N.J. Super. 198, 247 (App. Div. 2014) (internal quotation marks omitted) (quoting Carey v. Lovett, 132 N.J. 44, 64 (1993)). An abuse of discretion occurs when a decision is "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002) (citation omitted).

---

[1] Plaintiffs obtained a default judgment against J.C. Rack and Rodriguez, and Avalos was dismissed from the case.

The net opinion rule "forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data." State v. Townsend, 186 N.J. 473, 494 (2006). It mandates that an expert provide "the why and wherefore that supports the opinion, rather than a mere conclusion." Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013) (internal quotation marks and citations omitted). "The failure of an expert to give weight to a factor thought important by an adverse party does not reduce his testimony to an inadmissible net opinion if he otherwise offers sufficient reasons which logically support his opinion." Rosenberg v. Tavorath, 352 N.J. Super. 385, 402 (App. Div. 2002). "[A]n expert witness is always subject to searching cross-examination as to the basis of his opinion[.]" Glenpointe Assocs. v. Twp. of Teaneck, 241 N.J. Super. 37, 54 (App. Div. 1990) (citation omitted).

The Occupational Safety and Health Administration Agency (OSHA) classifies all worksite employers into one or more categories. Plaintiffs' expert, Brooks Rugemer (Rugemer), classified Diversified as: (1) a creating employer (one that "caused a hazardous condition that violates an OSHA standard"); (2) an exposing employer (one "whose own employees are exposed to a hazard"); (3) a correcting employer (one "who is engaged in a common undertaking, on

the same worksite, as the exposing employer and is responsible for correcting a hazard"); and (4) a controlling employer (one "who has general supervisory authority over the worksite, including the power to correct safety and health violations itself or require others to correct them").  He classified Schreiber as an exposing employer, a correcting employer, and a controlling employer. Diversified and Schreiber contend that Rugemer provided mere conclusions, rather than "the why and wherefore that supports [his] opinion[.]" Saddle River, 216 N.J. at 144 (internal quotation marks and citations omitted).

N.J.R.E. 702 governs the admissibility of expert testimony:  "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."  N.J.R.E. 702 imposes three basic requirements:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [Creanga v. Jardal, 185 N.J. 345, 355 (2005) (internal quotation marks and citations omitted).]

N.J.R.E. 703 governs the underlying bases of expert opinion testimony:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Rugemer did not provide "sufficient reasons which logically support his opinion" as to the cause of plaintiff's death nor who bore responsibility for the accident. Rosenberg, 352 N.J. Super. at 402. As the judge noted, the report does not contain an explanation as to how a possible classification alone creates liability. There must be evidentiary support for an expert's conclusion, and the expert must base his opinion on facts or data. See Bahrle v. Exxon Corp., 279 N.J. Super. 5, 30 (App. Div. 1995). Rugemer's report did not provide sufficient detail, and it did not sufficiently indicate that his opinion and conclusions were based on factual evidence. Thus, the motion judge properly barred the report from evidence.

## II.

Plaintiffs contend the judge improperly determined that Diversified did not or could not have had knowledge that it hired an incompetent subcontractor. In his written decision, the motion judge stated that:

A-0761-18T4

> No evidence has been provided to this court's satisfaction that [d]efendant Diversified had any indication that anyone working for J[.]C[.] Rack, including Mr. Jose Avalos[,] who operated the forklift on the date in question, was anything but competent to do the job requested. Even if this court were to find that J[.]C[.] Rack was incompetent by means of any liability associated with the actions of Mr. Avalos, and that such incompetence is what led to the death of plaintiff, plaintiff cannot prove that [d]efendant Diversified knew or should have know[n] of said incompetence.

Principals are not liable for the actions of independent contractors, absent one of three exceptions: (1) the principal retains control of the manner and means of the performance of the contracted work; (2) the principal retains an "incompetent contractor"; and (3) the activity is a nuisance per se. Majestic Realty Assocs., Inc. v. Toti Contracting Co., 30 N.J. 425, 431 (1959). In this case, the issue is whether Diversified hired an "incompetent contractor."

> [T]o prevail against the principal for hiring an incompetent contractor, a plaintiff must show that the contractor was, in fact, incompetent or unskilled to perform the job for which he/she was hired, that the harm that resulted arose out of that incompetence, and that the principal knew or should have known of the incompetence.
>
> [Puckrein v. ATI Transp., Inc., 186 N.J. 563, 576 (2006).]

7

In Puckrein, plaintiff-decedents were killed when their automobile was struck by an unregistered and uninsured tractor-trailer with defective brakes. Id. at 567. The tractor-trailer was owned by ATI Transport, Inc. (ATI) and was transporting material for Browning-Ferries Industries of New York, Inc. (BFI) at the time of the accident. Ibid. The judge granted summary judgment to BFI, and we affirmed. Ibid. However, our Supreme Court reversed, explaining that, "when a person engages an independent contractor to do work that is not itself a nuisance, he is not vicariously liable for the negligent acts of the contractor in the performance of the contract." Id. at 574. "Generally . . . the principal is not vicariously liable for the torts of the independent contractor if the principal did not direct or participate in them." Ibid. (alteration in original) (quoting Baldasarre v. Butler, 132 N.J. 278, 291 (1993)).

In Mavrikidis v. Petullo, the owner of a company hired an independent contractor to repave the asphalt at his premises. 153 N.J. 117, 125 (1998). The contractor's dump truck collided with the plaintiff's car, causing her injuries. Id. at 124-25. The plaintiff sued the contractor and the owner. Id. at 129. A jury found that the owner was "negligent in engaging a careless, reckless or incompetent contractor," and that the negligence was the proximate cause of the plaintiff's injuries. Id. at 130. But we reversed, concluding there was

8

insufficient evidence to support a finding that the owner was negligent in hiring the contractor. Id. at 131. The Court affirmed, explaining that there was no evidence that the contractor was incompetent to perform the work it was hired to do. Id. at 137. The Court held that even if the contractor was incompetent, the owner had no knowledge of that. Id. at 138. As the Court opined, the poor condition of the contractor's trucks did not evince its incompetency to replace asphalt—the job it was hired to perform. Id. at 138-42.

Thus, in Mavrikidis, the plaintiff's injury occurred not as part of the paving job, but rather during the hauling of equipment to the job site. Id. at 125. This is a vastly different case than that presented in Puckrein, in which the plaintiffs were injured while ATI transported material for BFI—the job that ATI was hired to do. 186 N.J. at 567. In Puckrein, transportation was not peripheral to the contract—like it was in Mavrikidis—but rather it was the essence of contract. Id. at 578. The Court explained that, "the hauler's basic competency included, at a minimum, a valid driver's license, a valid registration certificate, and a valid liability insurance identification card," and that without those, the hauler "ha[d] no right to be on the road at all." Ibid. "[A]n employer may be charged with negligence in hiring an independent contractor where it is demonstrated that he should have known, or might by the exercise of reasonable

A-0761-18T4

care have ascertained, that the contractor was not competent." Id. at 579 (citation omitted). "The extent of the inquiry obviously depends on the status of the principal and the nature of the task that the contract covers." Ibid.

David Longo (David), Diversified's warehouse manager, oversaw the Schreiber job performed by J.C. Rack, and was responsible for ensuring that the subcontractors were doing the correct job. When asked if he ever made a determination as to whether the person operating the forklift at the time of the incident was licensed, David testified that it was "up to [Rodriguez] to make sure his crew[] . . . members have licenses." He said that Diversified ensured that Rodriguez was licensed, but that it was Rodriguez's responsibility to make sure that an employee operating a forklift was licensed.

David knew that not all of J.C. Rack's crew members were licensed. But he testified that whoever operates a forklift has to be licensed and that the subcontractor has the ability to decide to which crew members to assign responsibilities. David said that he asked Rodriguez if the forklift driver was licensed approximately one month after the accident, and Rodriguez replied that he was. Though aware that forklift operators must be licensed or certified, Stephen Longo (Stephen), Diversified's logistics coordinator/in-house project manager, stated that he was "not sure if [J.C. Rack] had [its] forklift license or

10

not, but we require [it] to have a forklift license," and that Diversified does not "track" a subcontractor's forklift license. Additionally, Diversified contends that it "did not load or unload the truck," "did not dismantle and/or bundle the racking systems," and "did not reinstall the racking systems." Diversified's project manager visited the job site for approximately thirty minutes each day but was not on-site when the accident occurred.

At the time of the accident, Rodriguez believed Avalos was certified to operate a forklift, but thereafter learned that Avalos's prior certification had expired. Diversified also states that Avalos only worked "on and off" for J.C. Rack for a few months and operated a forklift for J.C. Rack "a few times prior to the accident." Diversified did not know which J.C. Rack crew members would be working at the time of the accident. Diversified also cites to Mavrikidis, in which our Court stated that, "[i]mposing a duty on a contractee to check the driving record and credentials of the contractor's employees or to inspect the contractor's equipment would impose a very onerous burden on the contractee." 153 N.J. at 142.

Here, Diversified hired J.C. Rack to unload trucks, which was merely "part of the overall process" because J.C. Rack was hired to "complete multiple tasks," such as disassembling the racking system, bundling and packing it,

loading it onto a truck, unloading it at a second location, unbundling and unpacking it at this second location, and then reassembling it. As such, it claims that the use of the forklift "was only part of the tasks required by the contract" between Diversified and J.C. Rack. The issue however still hinges on whether J.C. Rack's employee was properly certified to operate a forklift or if he was an incompetent contractor. As this was crucial to the contract between Diversified and J.C. Rack—and not merely peripheral—Diversified could potentially be liable for hiring an incompetent independent contractor.

But to prevail against Diversified, plaintiffs must show that: (1) J.C. Rack was incompetent or unskilled to perform the job for which it was hired; (2) J.C. Rack's incompetence caused plaintiff's death; and (3) Diversified knew or should have known of the incompetence. Puckrein, 186 N.J. at 576. Diversified inquired into whether Rodriguez—as J.C. Rack's owner—was licensed. The fact that J.C. Rack employed individuals who were not certified forklift drivers does not necessarily mean that Diversified retained an incompetent contractor because J.C. Rack performed other tasks on the job, like disassembling racking systems, bundling and packing them, and then unbundling and reassembling them. Diversified essentially concedes it had a duty to inquire about certifications, and it did so by ensuring that Rodriguez himself was certified to

12

operate forklifts. However, in accordance with <u>Mavrikidis</u>, Diversified did not have a duty to check every J.C. Rack employees' credentials. 153 N.J. at 142.

III.

Plaintiffs argue that Diversified is liable under general negligence principles for J.C. Rack's and Avalos's conduct. "[O]rdinarily[,] negligence must be proved and will never be presumed, . . . indeed there is a presumption against it, and . . . the burden of proving negligence is on the plaintiff." <u>Buckelew v. Grossbard</u>, 87 N.J. 512, 525 (1981). "[A] negligence cause of action requires the establishment of four elements: (1) a duty of care, (2) a breach of that duty, (3) actual and proximate causation, and (4) damages." <u>Jersey Cent. Power & Light Co. v. Melcar Util. Co.</u>, 212 N.J. 576, 594 (2013). Whether one owes a duty is a question of law to be decided by the trial judge. <u>Carvalho v. Toll Bros. & Developers</u>, 143 N.J. 565, 572 (1996). "[N]o bright line rule . . . determines when one owes a legal duty to prevent a risk of harm to another." <u>Wlasiuk v. McElwee</u>, 334 N.J. Super. 661, 666 (App. Div. 2000).

The imposition of a duty depends on several factors, including: (1) "the relationship of the parties"; (2) "the nature of the attendant risk"; (3) "the opportunity and ability to exercise care"; and (4) "the public interest in the proposed solution." <u>Hopkins v. Fox & Lazo Realtors</u>, 132 N.J. 426, 439 (1993).

13

"Ultimately, . . . the question of whether a duty exists is one of 'fairness' and 'public policy.'" Wlasiuk, 334 N.J. Super. at 666-67 (citations omitted). Our Supreme Court "[c]ombin[es] and weigh[s] all relevant factors" such as,

> the foreseeability of the nature and severity of the risk of injury based on the defendant's actual knowledge of dangerous conditions, the relationship of the parties and the connection between the defendant's responsibility for work progress and safety concerns, and the defendant's ability to take corrective measures to rectify the dangerous conditions[.]
>
> [Alloway v. Bradlees, Inc., 157 N.J. 221, 231-32 (1999).]

"[G]eneral and subcontractors have a joint, non-delegable duty to maintain a safe workplace that includes ensur[ing] prospective and continuing compliance with the legislatively imposed non-delegable obligation to all employees on the job site, without regard to contractual or employer obligations." Id. at 237 (second alteration in original) (internal quotation marks and citation omitted).

> [T]he State's statutory imposition of a duty on the general contractor expressed a clear legislative intention "to ensure the protection of all of the workers on a construction project, irrespective of the identity and status of their various and several employers, by requiring, either by agreement or by operation of law, the designation of a single repository of the responsibility for the safety of them all."
>
> [Id. at 238 (quoting Bortz v. Rammel, 151 N.J. Super. 312, 321 (App. Div. 1977)).]

14

In <u>Carvalho</u>, a town retained an engineer to prepare plans for the construction of a sewer service. 143 N.J. at 569. A general contractor was hired for the project, who hired a subcontractor. <u>Ibid.</u> Later, the engineer hired an inspector as the site representative. <u>Id.</u> at 570. A trench collapsed at the site, killing an employee of the subcontractor. <u>Id.</u> at 571-72. The employee settled with the general and subcontractors, <u>id.</u> at 572, but the Court analyzed the connected foreseeability of the harm and considerations of fairness and public policy to determine whether to hold the engineer liable. <u>Id.</u> at 573.

The Court recognized that, "[w]hereas the magnitude and likelihood of potential harm are objectively determinable, the propriety of imposing a duty of care is not." <u>Ibid.</u> (quoting <u>Weinberg v. Dinger</u>, 106 N.J. 469, 485 (1987)).

> Although in many cases a duty of care can arise simply from the determination of the foreseeability of harm, usually more is needed to find such a duty, that more being the value judgment, based on an analysis of public policy, that the actor owed the injured party a duty of reasonable care.
>
> [<u>Ibid.</u> (internal quotation marks and citations omitted).]

Here, we consider "fairness and policy," by weighing foreseeability based on: (1) Diversified's actual knowledge of dangerous conditions; (2) the relationship between Diversified and plaintiff; and (3) the connection between Diversified's responsibility for work progress and safety concerns, including its

15

ability to take corrective measures to rectify dangerous conditions. Alloway, 157 N.J. at 231-32.

It is reasonably foreseeable that a subcontractor could be injured because of dangerous conditions on one of Diversified's jobs. Plaintiff was one of Diversified's subcontractors. Diversified however did not have direct contact with plaintiff on-site, rather plaintiff worked directly with J.C. Rack—another Diversified subcontractor. The relationship between the parties is still contractual, though a little more attenuated, as there was no direct contact between the two on-site.

In Carvalho, the issue was the relationship between a subcontractor's employee and an engineer hired by the town in which the construction was taking place. 143 N.J. at 569, 571-72. But this case is distinguishable, even though plaintiff is akin to the subcontractor's employee, because Diversified is not akin to the engineer, but instead, the general contractor. Nevertheless, Diversified—who did not supervise nor was it required to supervise the work of J.C. Rack—took corrective measures to ensure that forklift drivers be certified to operate forklifts.

IV.

16

Plaintiffs argue that OSHA regulations should be considered in determining Diversified's and Schreiber's liability. The purpose of the Occupational Safety and Health Act (the Act), 29 U.S.C. §§ 651 to 678, is "to provide for the general welfare, to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources[.]" 29 U.S.C. § 651(b). The Act requires "employers to comply with specific OSHA standards and also imposes a general duty on employers to provide a workplace 'free from recognized hazards that are causing or are likely to cause death or serious physical harm.'" Gonzalez v. Ideal Tile Importing Co., Inc., 371 N.J. Super. 349, 359-60 (App. Div. 2004) (emphasis omitted) (quoting 29 U.S.C. § 654(a)).

But, "the finding of an OSHA violation does not ipso facto constitute a basis for assigning negligence as a matter of law; that is, it does not constitute negligence per se." Kane v. Hartz Mountain Indus., Inc., 278 N.J. Super. 129, 144 (App. Div. 1994). Thus, while the existence of an OSHA violation may be evidence that a company did not follow the OSHA regulations, it is not evidence that a company was liable as either a property owner or a general contractor. As a result, OSHA regulations may be considered in determining Diversified's and Schreiber's liability, but such regulations are not determinative.

17

V.

Finally, plaintiffs contend that there exists a genuine issue of material fact to preclude summary judgment. When reviewing an order granting summary judgment, we apply "the same standard governing the trial court[.]" Oyola v. Xing Lan Liu, 431 N.J. Super. 493, 497 (App. Div. 2013). A court should grant summary judgment when the record reveals "no genuine issue as to any material fact" and "the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). We owe no special deference to the motion judge's conclusions on issues of law. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). We consider the facts in a light most favorable to the non-moving party. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995). "An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." R. 4:46-2(c).

Here, plaintiffs argue that there is a fact issue about whether Diversified was aware of the training, supervision, and certification of the forklift operator unloading plaintiff's truck. But we see no genuine issues of material fact. As to Diversified, summary judgment was appropriate for reasons previously

18

explained. And as to Schreiber, summary judgment was appropriate because Schreiber had no control over the methods or means of unloading the truck, and did not have knowledge that Diversified hired J.C. Rack to aid in dismantling and reassembling the shelving units.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0761-18T4