SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**James R. Jarrell, et al. v. Richard A. Kaul, M.D., et al.** (A-42-13) (072363)

**Argued October 20, 2014 -- Decided September 29, 2015**

**CUFF, P.J.A.D. (temporarily assigned), writing for a majority of the Court.**

In these appeals, the Court examines three issues related to the statutory requirement that physicians licensed to practice medicine in New Jersey must obtain and maintain medical malpractice liability insurance pursuant to N.J.S.A. 45:9-19.17. Specifically, the court considers whether: (1) an injured patient may bring a direct action against a negligent, uninsured physician; (2) failure to comply with the statutory liability insurance mandate gives rise to an informed consent claim; and (3) a health care facility that grants privileges to a physician to use its facilities to treat patients has a continuing duty to ascertain a physician's compliance with the insurance requirement.

In September 2005, plaintiff James Jarrell, who suffered from chronic back pain, was referred to defendant Dr. Richard A. Kaul, a board certified anesthesiologist who practiced at defendant Market Street Surgical Center (MSSC). In October 2005, Dr. Kaul performed a spinal fusion procedure on Jarrell. Following the surgery, Jarrell experienced new pain in his left side that worsened over time and led to a "drop foot." In January 2006, Jarrell was examined by a board certified neurosurgeon, who concluded that the pain and drop foot were caused by Dr. Kaul's improper placement of some screws that pinched a nerve. At the time of the October 2005 procedure, Dr. Kaul had a malpractice insurance policy that specifically excluded spinal surgery. Although he claimed to have $500,000 in liquid assets, he did not have a letter of credit in that amount. The Board of Medical Examiners (BME) revoked Dr. Kaul's license to practice medicine in 2012.

Jarrell and his wife (collectively, plaintiffs) filed a complaint against Dr. Kaul and MSSC. On summary judgment, the court found that there was no cause of action against Dr. Kaul for deceit, misrepresentation, lack of informed consent, or battery based on his failure to maintain insurance. The trial court also dismissed plaintiffs' claims against MSSC because they lacked an expert who would testify that MSSC deviated from accepted standards of medical care by failing to properly ascertain Dr. Kaul's credentials and by permitting an uninsured physician to perform spinal procedures in its facility. Trial proceeded against Dr. Kaul limited to the issue of medical negligence, and the jury found that Dr. Kaul negligently performed the spinal fusion, which proximately caused Jarrell's injury.

Dr. Kaul appealed and plaintiffs cross-appealed. The Appellate Division affirmed the summary judgment orders, the jury verdict, and the damages award. The panel held that the trial court properly dismissed all claims against Dr. Kaul based on his lack of insurance because N.J.S.A. 45:9-19.17 does not provide a private cause of action for injured parties. For the same reasons, the panel concluded that N.J.S.A. 45:19-17(b), does not permit a direct action by a patient against a surgical center that permits an uninsured or underinsured physician to use its facilities. This Court denied Dr. Kaul's petition for certification, but granted plaintiffs' cross-petition. 216 N.J. 366 (2013).

**HELD:** Under N.J.S.A. 45:9-19.17, an injured patient does not have a direct cause of action against a physician who does not possess medical malpractice liability insurance or a suitable letter of credit. Moreover, failure to comply with the statutory liability insurance mandate does not give rise to an informed consent claim. Finally, a cause of action for negligent hiring may be asserted against a health care facility that grants privileges to a physician who has not complied with the statutorily required insurance provisions.

1. Beginning in 1998, the Legislature required physicians to maintain medical malpractice liability insurance. If a physician could not obtain insurance, he or she could post a letter of credit. The statute, N.J.S.A. 45:9-19.17, was later amended to require physicians to maintain insurance in the amount of at least $1 million per occurrence and $3 million per policy year, or to post a letter of credit for $500,000. The intent of these provisions is to ensure that citizens will have some recourse for adequate compensation in the event of medical malpractice. (pp. 12-16)

2. While both the statute and its implementing regulations expressly provide that a physician who does not obtain medical malpractice insurance or a suitable letter of credit is subject to disciplinary action by the BME and civil penalties, neither expressly provides that an injured patient has a direct cause of action against a treating physician who does not comply with the statutory requirements. However, although courts should hesitate to recognize any

unmentioned remedy, both the United States Supreme Court and this Court have held that a statute may implicitly create a private cause of action. (pp. 16-18)

3. In order to determine whether an implicit private cause of action exists here, the Court considers the legislative history and statutory language. The Court finds that the BME was expressly deemed the intended vehicle to ensure compliance with the statutory requirements, a choice which reflects a legislative decision to encourage and force compliance, rather than wait for a complaint by an injured patient. A post-injury direct claim is reactive and does little to further the goal of creating a source of compensation for patients injured by negligent medical care. Thus, the Court concludes that N.J.S.A. 45:9-19.17 neither expressly nor implicitly recognizes a direct cause of action by an injured patient against a physician who fails to obtain the statutorily required medical malpractice liability insurance or letter of credit. (pp. 18-21)

4. The Court next turns to the question of informed consent, which is a negligence concept predicated on a physician's duty to disclose material information that will allow a patient to intelligently assess the nature and risks of a proposed treatment or procedure. A risk is material if a reasonable patient would likely attach significance to it in deciding whether to forego the treatment. The validity of the consent obtained from a patient normally is confined to disclosure of the associated risks, but consent may, in certain circumstances, be vitiated by a physician's significant misrepresentations of credentials or experience. In such circumstances, a plaintiff must show that the physician's more limited experience or credentials could have substantially increased the risk and that the increased risk would cause a reasonably prudent patient not to consent. A physician's failure to comply with N.J.S.A. 45:9-19.17 is not a perfect fit with this jurisprudence since it does not necessarily mean that the physician is unskilled and since lack of insurance bears no relation to the risks attendant to a proposed treatment or procedure. The Court discerns no principled reason to depart from its prior jurisprudence and extend the relief that the informed consent doctrine may provide to an injured patient in order to address the financial insecurity of a physician. (pp. 21-31)

5. Turning to plaintiffs' claim that MSSC had a duty to limit the use of its facility only to those physicians who satisfy the statutory insurance requirements, the Court notes that, generally, a person who engages an independent contractor is not liable for the negligence of that contractor. An exception is made if the contractor is incompetent, although liability is limited to the physical harm that is caused. In cases invoking this exception, lack of financial responsibility, including the absence of insurance, was not considered as indicative of incompetence. However, when a task requires specific permits or licenses, retention of a contractor without those necessary credentials subjects the business to liability for hiring an incompetent contractor. Likewise, granting privileges to a physician lacking the appropriate credentials also exposes a health care facility to liability. (pp. 31-41)

6. Here, the basic element of competency for any physician seeking surgical privileges at MSSC's facility is possession of a license to practice medicine in New Jersey, and an essential condition for such a license is possession of a medical malpractice liability insurance policy or an acceptable letter of credit. MSSC had an initial duty to ascertain that Dr. Kaul possessed the requisite license and a continuing duty to assure that his license was maintained. The record reveals that MSSC knew that Dr. Kaul possessed an insurance policy that expressly excluded the procedure performed on Jarrell. Although Dr. Kaul asserted that he had advised the BME and MSSC that he possessed sufficient assets to satisfy the alternative letter of credit requirement, such a representation does not satisfy the regulatory definition of a letter of credit. Moreover, the record is barren of any evidence that the BME accepted this representation. Consequently, since discovery is required to clarify several issues integral to plaintiffs' negligent hiring claim, the trial court erred in granting summary judgment in favor of MSSC. (pp. 41-44)

The judgment of the Appellate Division is **AFFIRMED IN PART** and **REVERSED IN PART**, and the matter is **REMANDED** for further proceedings consistent with the Court's opinion.

**JUSTICE ALBIN, DISSENTING IN PART** and **CONCURRING IN PART,** joined by **CHIEF JUSTICE RABNER,** expresses the view that the facts here present the quintessential case of lack of informed consent, and that a logical extension of New Jersey's informed consent jurisprudence would permit a cause of action if a plaintiff established four elements: (1) the physician was uninsured to perform the medical procedure; (2) the physician failed to inform the patient that he was uninsured; (3) the patient would not have undergone the procedure if properly informed; and (4) the plaintiff can prove damages.

**JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUDGE CUFF's opinion. JUSTICE ALBIN filed a separate opinion dissenting in part and concurring in part, in which CHIEF JUSTICE RABNER joins.**

2

JAMES R. JARRELL and SHEILA
G. JARRELL, his wife,

    Plaintiffs-Appellants,

       v.

RICHARD A. KAUL, M.D. and
MARKET STREET SURGICAL
CENTER,

    Defendants-Respondents,

       and

JOHN T. FORD, SUSSEX COUNTY
TOTAL HEALTH CENTER, INC.,

    Defendants.

Argued October 20, 2014 – Decided September 29, 2015

On certification to the Superior Court, Appellate Division.

Lewis Stein argued the cause for appellants (Nusbaum, Stein, Goldstein, Bronstein & Kron).

Jeffrey B. Randolph argued the cause for respondent Richard A. Kaul, M.D.

Peter E. Rhatican argued the cause for respondent Market Street Surgical Center.

Abbott S. Brown argued the cause for amicus curiae New Jersey Association for Justice (Lomurro, Davison, Eastman and Munoz, attorneys; Mr. Brown and Christina Vassiliou Harvey, on the brief).

JUDGE CUFF (temporarily assigned) delivered the opinion of the Court.

In this appeal, we examine three issues related to the statutory requirement that physicians licensed to practice medicine in New Jersey and providing medical care in this State must obtain and maintain medical malpractice liability insurance. The first issue presented in this appeal is whether an injured patient may bring a direct action against a negligent, uninsured physician. The second issue is whether a physician has a duty to advise a prospective patient that he is in compliance with the statutory medical malpractice liability insurance requirement and whether the failure to obtain such insurance gives rise to a lack of informed consent claim. The third issue is whether a health care facility that grants privileges to a physician to use its facilities to treat patients has a continuing duty to ascertain a physician's compliance with the insurance requirement.

Plaintiff James R. Jarrell sought treatment for persistent pain in his back from defendant Dr. Richard A. Kaul, a board certified anesthesiologist. The doctor performed a spinal fusion procedure at a surgical center. At the time of the operation, Dr. Kaul was required to have medical malpractice liability insurance or to have posted a letter of credit. The medical malpractice liability insurance issued to him expressly

2

excluded spinal surgical procedures. Dr. Kaul instead maintains that he produced a suitable letter of credit.

The surgery performed by Dr. Kaul actually increased Jarrell's discomfort, so he sought treatment from another physician. Another surgeon performed a surgical revision of the procedure performed by Dr. Kaul.

Jarrell and his wife, Sheila, filed a complaint alleging that Dr. Kaul negligently performed the initial spinal procedure, and they sought compensatory damages for pain and suffering and economic losses caused by the physician's negligence. They also asserted a direct claim against Dr. Kaul based on his status as an uninsured physician at the time he treated Jarrell. Based on Dr. Kaul's lack of liability insurance, plaintiffs also asserted claims seeking damages for misrepresentation, fraud, deceit, and lack of informed consent. They also asserted a negligent hiring claim against the facility where Dr. Kaul performed the surgery. Jarrell's wife asserted a loss of consortium claim. Only the negligence claim proceeded to trial. A jury awarded $500,000 to Jarrell and $250,000 to his wife. All of the other claims were dismissed prior to trial.

Although it is undisputed that Dr. Kaul was uninsured for the procedure he performed on Jarrell, we affirm the dismissal of Jarrell's direct claim against the physician for his failure

3

to maintain insurance. The statute imposing the medical malpractice liability insurance requirement does not expressly authorize a direct action against a noncompliant physician and neither the language nor the purpose of the statute supports such a claim.

Although a reasonably prudent patient may consider a physician's compliance with the statutorily imposed liability insurance requirement material information, lack of compliance or failure to disclose compliance does not necessarily provide the predicate for an informed consent claim. Indeed, using the informed consent doctrine to address the financial insecurity of a physician and the inability of a patient to satisfy a judgment or to fund a settlement would represent a marked departure from our prior informed consent jurisprudence. We decline to follow that course.

Finally, we hold that a health care facility that grants privileges to physicians has a continuing duty to ensure that those physicians have and maintain the required medical malpractice liability insurance or have posted a suitable letter of credit that conforms with the statutory requirement.

I.

Jarrell suffered from chronic back pain for many years. His chiropractor referred him to Dr. Kaul, a board certified anesthesiologist, in September 2005. Dr. Kaul's practice

4

focused on pain management and minimally invasive spinal procedures.  In 2005, Dr. Kaul saw patients and performed procedures at Market Street Surgical Center (MSSC) in Saddle Brook several times a week.  Dr. Kaul also served as the Medical Director of MSSC until 2007.

Dr. Kaul diagnosed Jarrell with a herniated lumbar disc, lumbar radiculopathy, and discogenic back pain.  On October 11, 2005, Dr. Kaul performed a spinal fusion procedure in which he fused the L4, L5, and S1 vertebrae using two mesh cages attached by rods and pedicle screws.  Immediately following the surgery, Jarrell experienced new pain in his left side that worsened over time and eventually led to a "drop foot,"[1] causing him to fall.

A friend referred Jarrell to Dr. Alfred Steinberger, a board certified neurosurgeon, in January 2006.  Following an examination and diagnostic tests, Dr. Steinberger concluded that Dr. Kaul improperly placed some screws that pinched a nerve causing the pain and drop foot.  On January 31, 2006, Dr. Steinberger removed and replaced the fixation devices implanted by Dr. Kaul in October 2005.  Jarrell's pain decreased immediately following the second procedure; however, at the time

---

[1] "Drop foot" is "a general term for difficulty lifting the front part of the foot.  If you have foot drop, you may drag the front of your foot on the ground when you walk."  Mayo Clinic Staff, Diseases and Conditions:  Foot drop, MayoClinic.org (last visited June 19, 2015), www.mayoclinic.org/disease-conditions/foot-drop/basics/definition/con-20032918.

of his January 2012 trial, he still required pain medication, including fentanyl patches, and his physical activity was limited.

Dr. Kaul was educated in England, where he practiced as a dental anesthesiologist. He relocated to New Jersey and obtained a license to practice medicine in 1995. Thereafter, he commenced a pain management practice and performed various spinal procedures, including the spinal fusion procedure he conducted on Jarrell.

At the time of the October 2005 spinal procedure, Dr. Kaul had a malpractice insurance policy that specifically excluded spinal surgery. He claimed to have $500,000 in liquid assets but did not have a letter of credit from a bank or other financial institution. Dr. Kaul did not discuss his insurance coverage, or lack thereof, with Jarrell or his wife. Neither Jarrell nor his wife inquired about Dr. Kaul's insurance coverage.

The Board of Medical Examiners (BME)[2] revoked Dr. Kaul's license to practice medicine in 2012.

## II.

Jarrell and his wife filed a nine-count complaint in the Superior Court against Dr. Kaul and MSSC. Jarrell asserted a

---

[2] The BME is the administrative body that regulates the practice of medicine in this State.

claim against Dr. Kaul for medical negligence alleging that he departed from accepted standards of medical care in his choice of procedure and his selection of medical devices for use in the surgery. (Count One). Jarrell further alleged that Dr. Kaul misrepresented his qualifications and training, thereby wrongfully obtaining his informed consent for the surgery. (Count Two). Jarrell also claimed that MSSC negligently and unreasonably facilitated performance of an unauthorized surgical procedure by an unqualified physician. (Count Five). His wife asserted a loss of consortium claim. (Count Seven).

Jarrell also alleged that Dr. Kaul performed the October 2005 surgical procedure without the statutorily required malpractice insurance or letter of credit and withheld this information from him. He alleged that Dr. Kaul's noncompliance formed the basis for a claim sounding in deceit, fraudulent misrepresentation, and lack of informed consent (Count Eight), as well as a battery claim (Count Nine). Plaintiffs also asserted claims against John T. Ford and Sussex County Total Health Center, Inc. (Counts Three and Four), which were dismissed.

Plaintiffs' motion for summary judgment based on Dr. Kaul's failure to carry medical malpractice insurance that covered the spinal procedure performed on Jarrell was denied. The motion judge reasoned that Dr. Kaul had informed the BME that he had

substantially complied with the statutory requirement, and the BME had not placed any limits on his license to practice medicine. Plaintiffs renewed this motion immediately prior to trial and Dr. Kaul filed a cross-motion for summary judgment. The trial court granted Dr. Kaul's cross-motion. The court reasoned that Basil v. Wolf, 193 N.J. 38 (2007), precluded any form of direct action against Dr. Kaul for failing to maintain insurance. The court held that there was no cause of action against Dr. Kaul for deceit, misrepresentation, lack of informed consent, and battery based on the failure to maintain insurance. The trial court also dismissed plaintiffs' claims against MSSC because plaintiffs lacked an expert who would testify that MSSC deviated from accepted standards of medical care by failing to properly ascertain Dr. Kaul's credentials and permitting an uninsured and unqualified physician to perform spinal procedures in its facility.

Trial proceeded solely against Dr. Kaul limited to the issue of medical negligence. The jury found that Dr. Kaul negligently performed the October 2005 spinal fusion and his negligence proximately caused injury to Jarrell. The jury awarded $500,000 in damages to Jarrell for his pain, suffering, and disability, and $250,000 to his wife for loss of consortium. All post-trial motions for a new trial or remittitur were denied.

Dr. Kaul appealed, arguing that significant trial errors required a reversal of the judgment and a new trial. Plaintiffs filed a cross-appeal contending that the trial court erroneously denied their motion for summary judgment and erroneously granted partial summary judgment in favor of Dr. Kaul based on Dr. Kaul's lack of insurance. They also contended that the trial court erred in granting summary judgment in favor of MSSC based on Dr. Kaul's credentials and lack of insurance.

In an unreported opinion, the Appellate Division affirmed the summary judgment orders, the jury verdict, and the damages award. The appellate panel held that the trial court properly dismissed all claims against Dr. Kaul based on his lack of insurance because N.J.S.A. 45:9-19.17 does not provide a private cause of action for injured patients. The panel based this decision largely on this Court's opinion in Basil, supra, 193 N.J. at 72, in which the Court stated that the statutory medical malpractice insurance requirement placed noncompliant physicians on notice only that they may be subject to disciplinary action by the BME. For the same reasons, the panel concluded that N.J.S.A. 45:9-19.17(b) does not permit a direct action by a patient against a surgical center that permits an uninsured or underinsured physician to use its facilities.

This Court denied Dr. Kaul's petition for certification but granted plaintiffs' cross-petition. Jarrell v. Kaul, 216 N.J.

9

366 (2013).  The Court also admitted the New Jersey Association for Justice (NJAJ) to appear as amicus curiae.

                                III.

     Plaintiffs urge that the Appellate Division's reliance on Basil was misplaced.  They contend that the discussion on which it relied to foreclose a direct cause of action against Dr. Kaul due to his lack of medical malpractice insurance is mere dicta.  They also urge this Court to draw a distinction between "mere negligent failure to maintain malpractice insurance versus gross negligence or intentional concealment, deceit, and lack of informed consent (battery)."  They request that the Court reconsider its position in Basil because the Court did not consider whether the statute requiring medical malpractice insurance implicitly authorized a direct action by a patient against an uninsured physician.  Plaintiffs urge that application of the three-prong analysis set forth in In re Resolution of State Commission of Investigation, 108 N.J. 35 (1987), leads to the conclusion that the Legislature implicitly created a private right of action.  Therefore, plaintiffs argue that all claims premised on Dr. Kaul's lack of insurance must be reinstated.

     Finally, plaintiffs maintain that Howard v. University of Medicine & Dentistry of New Jersey, 172 N.J. 537 (2002), suggests that an informed consent claim against Dr. Kaul should

                                 10

be permitted.  They contend that the ability of a physician to compensate a patient in the event of negligence is information that would be material to the reasonably prudent patient selecting a surgeon.

As to MSSC, plaintiffs urge that the Appellate Division misunderstood their claim against the facility.  Plaintiffs contend that they did not assert a respondeat superior or any theory of vicarious liability against MSSC.  Rather, they maintain that their claim against MSSC is premised on a duty of the surgical center to ensure that surgeons who perform procedures in its facility are qualified to perform those procedures and those qualifications include proper insurance or other suitable financial security.

Dr. Kaul responds that his lack of insurance does not permit a private right of action by injured patients.  He further contends that there is no legal basis to support plaintiffs' theory that lack of insurance vitiates any consent to perform a procedure.  Furthermore, he claims that although the policy of insurance excluded spinal surgery, he maintained insurance at the time of the surgery performed on Jarrell and he held sufficient financial assets at the time to comply with the statute.

MSSC contends that plaintiffs are attempting to establish a new duty for health care facilities that will expose them to

11

"financial ruin." It argues that N.J.S.A. 45:9-19.17 does not impose on health care facilities the duty to enforce the insurance requirement, and the BME has not adopted regulations requiring such action. It urges that the Appellate Division judgment barring a direct negligence claim against it based on the credentialing process should be affirmed.

Amicus NJAJ asserts that this appeal presents an opportunity for this Court to hold as a matter of law and sound public policy that patients' right to informed consent includes the right to know if their physician possesses insurance that covers the procedure for which consent is sought. Furthermore, every medical facility should be obliged to confirm on a regular basis that the physicians who have been granted privileges to perform procedures have the minimum amount of insurance coverage required by statute and that the insurance covers all procedures performed at the facility by the physician.

IV.

The Legislature first required physicians to maintain medical malpractice liability insurance in 1998. L. 1997, c. 365. The obligation extended to those physicians who were licensed in this State and who treated patients in this State. Id. at § 1. The 1998 legislation also permitted a physician to post a letter of credit if medical malpractice liability insurance was not available. Ibid. In addition, the

12

Legislature delegated to the BME[3] the authority to establish the minimum amounts per occurrence and per policy year of the required coverage. Ibid. The BME adopted a regulation that required physicians to maintain "insurance in the sum of $1 million per occurrence and $3 million dollars per policy year." N.J.A.C. 13:35-6.18(a).

In 2004, the Legislature amended the statute. The legislation established the minimum amount of medical malpractice liability insurance that a physician must obtain and maintain at $1,000,000 per occurrence and $3,000,000 per policy year. L. 2004, c. 17, § 25. The Legislature also set the minimum amount of the letter of credit at $500,000 and authorized the BME to require higher amounts for both insurance and the letter of credit. Ibid. It has not done so. See N.J.A.C. 13:35-6.18 (establishing minimum amounts per occurrence and per policy year at $1,000,000 and $3,000,000 respectively and $500,000 for letter of credit).

Codified as N.J.S.A. 45:9-19.17, the statute provides as follows:

> a. A physician who maintains a professional medical practice in this State and has responsibility for patient care is required to be covered by medical malpractice liability insurance issued by a carrier authorized to write medical malpractice

---

[3] The BME is the agency responsible for the licensure and discipline of licensed physicians in this State. N.J.S.A. 45:9-1, -2.

13

liability insurance policies in this State, in the sum of $1,000,000 per occurrence and $3,000,000 per policy year and unless renewal coverage includes the premium retroactive date, the policy shall provide for extended reporting endorsement coverage for claims made policies, also known as "tail coverage," or, if such liability coverage is not available, by a letter of credit for at least $500,000.

The physician shall notify the State Board of Medical Examiners of the name and address of the insurance carrier or the institution issuing the letter of credit, pursuant to section 7 of P.L. 1989, c. 300 ([N.J.S.A.] 45:9-19.7).

b. A physician who is in violation of this section is subject to disciplinary action and civil penalties pursuant to sections 8, 9 and 12 of P.L. 1978, c. 73 ([N.J.S.A.] 45:1-21 to 22 and 45:1-25).

c. The State Board of Medical Examiners may, pursuant to the "Administrative Procedure Act," P.L. 1968, c. 410 ([N.J.S.A.] 52:14B-1 et seq.), establish by regulation, minimum amounts for medical malpractice liability insurance coverage and lines of credit in excess of those amounts required pursuant to subsection a. of this section.

d. The State Board of Medical Examiners shall notify all physicians licensed by the board of the requirements of this section within 30 days of the date of enactment of P.L. 2004, c. 17.

The statement of the Assembly Health Committee accompanying the 1998 bill provided that the intent of the bill was "to ensure the citizens of the State that they will have some recourse for adequate compensation in the event that a physician or

14

podiatrist is found responsible for acts of malpractice." Assembly Health Comm., Statement to S. 267 (Sept. 19, 1996).

The BME adopted implementing regulations on April 5, 1999, which defined key phrases including "[m]aintaining a professional practice with responsibility for patient care," "[l]etter of credit," and "[n]ot available." N.J.A.C. 13:35-6.18(a). A "[l]etter of credit" is defined as "a non-assignable, non-transferrable, unexpired, continuous irrevocable obligation, liability bond or other instrument issued by a bank or savings association authorized to do business in this State." Ibid. Coverage is "[n]ot available" when the physician is unable to purchase insurance coverage from a carrier authorized to write it; however, insurance coverage that is unaffordable is still considered available. Ibid.

A physician who does not have medical malpractice insurance must present to the BME a letter of credit in the amount of $500,000, N.J.A.C. 13:35-6.18(b), and must promptly notify the BME if a demand for payment on the letter has been made or the continuing viability of the letter has been compromised, N.J.A.C. 13:35-6.18(d)(1)-(2). The failure of a physician obliged to obtain medical malpractice liability insurance or a letter of credit as required by the regulation is considered professional misconduct, N.J.A.C. 13:35-6.18(e), and he or she is subject to discipline in accordance with N.J.S.A. 45:1-21(e).

15

Such discipline may include revocation or suspension of the physician's license to practice medicine in this State.  See N.J.S.A. 45:1-21.

It is against this statutory and regulatory backdrop that we examine the three issues presented in this appeal.

V.

We commence our discussion of whether N.J.S.A. 45:9-19.17 bestows on an injured patient a private right of action against a physician who does not obtain or maintain statutorily required medical malpractice insurance[4] with an examination of the express language of the statute and the regulations adopted by the BME implementing this requirement.  As set forth above, the express terms of N.J.S.A. 45:9-19.17 provide that a physician who obtains neither a policy of medical malpractice insurance nor a letter of credit is subject to disciplinary action by the BME and civil penalties.  The implementing regulations reflect this legislative decision.  See N.J.A.C. 13:35-6.18(e).  Neither the statute nor the implementing regulations expressly provide that an injured patient has a direct cause of action against a treating physician who does not comply with the statutory financial responsibility provisions.

---

[4] When we refer to the requirement to maintain medical malpractice liability insurance, we include by implication the letter of credit alternative.  See N.J.S.A. 45:9-19.17(a).

16

Both the United States Supreme Court and this Court have held that a statute that does not expressly create a private cause of action may, nonetheless, implicitly create one. See Cort v. Ash, 422 U.S. 66, 78, 95 S. Ct. 2080, 2088, 45 L. Ed. 2d 26, 36 (1975) (addressing whether statute imposing criminal liability on corporation making political contributions created private right of action); State Comm'n of Investigation, supra, 108 N.J. at 40-41 (addressing whether subjects of investigation may seek enforcement of confidentiality obligations of investigatory agency). This Court employs a three-prong test that inquires

> [1] whether the plaintiff is "one of the class for whose especial benefit the statute was enacted"; [2] whether there is any evidence that the Legislature intended to create a private cause of action under the statute; and [3] whether implication of a private cause of action in this case would be "consistent with the underlying purposes of the legislative scheme."
>
> [State Comm'n of Investigation, supra, 108 N.J. at 41 (citations omitted) (quoting Cort, supra, 422 U.S. at 78, 95 S. Ct. at 2088, 45 L. Ed. 2d at 36).]

Through this inquiry the Court seeks to ascertain the underlying legislative intent. Jalowiecki v. Leuc, 182 N.J. Super. 22, 30 (App. Div. 1981). When the Legislature has expressly created specific remedies, a court should always hesitate to recognize another unmentioned remedy. See

17

Transamerica Mortg. Advisors, Inc. v. Lewis, 444 U.S. 11, 19, 100 S. Ct. 242, 247, 62 L. Ed. 2d 146, 154-55 (1979).  Stated differently, "[i]n the absence of strong indicia of a contrary [legislative] intent, we are compelled to conclude that [the Legislature] provided precisely the remedies it considered appropriate."  Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 15, 101 S. Ct. 2615, 2623, 69 L. Ed. 2d 435, 447 (1981).

There is scant legislative history associated with N.J.S.A. 45:9-19.17.  The committee statement accompanying this legislation simply states that the insurance requirement is designed to ensure a source of some compensation in the event of medical negligence.  Assembly Health Comm., Statement to S. 267, supra.  Notably, N.J.S.A. 45:9 generally regulates the practice of medicine and further requires physicians to undertake certain health-related tasks.  For example, N.J.S.A. 45:9-19.11 immunizes members of the BME from liability for actions taken in the course of their administrative obligations, and N.J.S.A. 45:9-22.3(b) immunizes a physician from liability for failing to distribute a breast cancer information booklet to a patient.  These instances suggest that the Legislature was content to entrust oversight of these responsibilities to the BME.

In Basil, supra, this Court noted that N.J.S.A. 45:9-19.17, when originally adopted in 1998, did not authorize a direct

18

action against an uninsured physician.  193 <u>N.J.</u> at 71, 72.  We reached that conclusion in the context of the statutory and regulatory scheme in place at the time the defendant physician examined the plaintiff.  <u>Id.</u> at 71-72, 73.  Notably, until the BME adopted regulations in 1999 to implement the 1998 statute, including a definition of "maintaining a professional practice with responsibility for patient care,"[5] it was not abundantly clear that physicians who simply performed independent medical examinations, such as the defendant physican, were required to maintain medical malpractice liability insurance.  <u>Id.</u> at 71-72.  Following the adoption of the regulations, however, "all practitioners . . . were on notice that . . . any physician who does not satisfy the insurance requirement would be incompetent to practice his profession."  <u>Id.</u> at 72.  Here, at the time Dr. Kaul treated plaintiff, there was no question that he was required to maintain liability insurance.

Applying the three-part test adopted by this Court in <u>State Commission of Investigation</u>, we determine that <u>N.J.S.A.</u> 45:9-19.17 does not create, expressly or implicitly, a direct cause of action by a patient against a noncompliant treating physician.  To be sure, a patient, such as Jarrell, may receive a direct benefit by virtue of the availability of insurance to

_____

[5] <u>N.J.A.C.</u> 13:35-6.18.

19

provide a source of funds to recompense for negligent care.  On the other hand, there is no evidence that the Legislature contemplated that enforcement of its determination -- that physicians providing medical care in this State must be insured -- would be advanced by bestowing a direct cause of action on an injured patient.  To the contrary, the Legislature expressly concluded that the administrative agency charged with regulating the licensure and discipline of physicians -- the BME -- would be the most likely vehicle to ensure compliance with the liability insurance requirement.

It is difficult to quarrel with this approach.  A physician is prohibited from providing medical care in New Jersey without a license, and the BME will not issue a license unless a physician establishes financial responsibility.  Noncompliance is considered professional misconduct and the BME has the authority to suspend or revoke a license to practice medicine of a noncompliant physician.  Administrative oversight and enforcement is the declared enforcement mechanism and that choice reflects a legislative decision to encourage and force compliance rather than wait for a complaint by an injured patient that may never be filed.

The underlying purpose of the legislation is predominately proactive.  The legislative intent is to create a source of compensation for a patient injured by negligent medical care.  A

20

post-injury direct claim against a noncompliant and negligent physician is reactive and does little to further the articulated goal.

We therefore conclude that N.J.S.A. 45:9-19.17 does not expressly, and cannot be read to implicitly, recognize a direct cause of action by an injured patient against a physician who fails to obtain the statutorily required medical malpractice liability insurance or letter of credit. The Appellate Division judgment that rejected such a cause of action is affirmed.

VI.

In Count Eight of the amended complaint, plaintiffs allege that Dr. Kaul knew that he was uninsured at the time that he obtained Jarrell's consent to perform surgery. Jarrell alleged that Dr. Kaul's uninsured status "would have been significant in [his] decision-making." Plaintiffs asserted that the failure to disclose this information constitutes "deceit, misrepresentation and outrageous conduct."

Before the trial court and on appeal, plaintiffs argued that the claims asserted in the amended complaint, as they pertained to Dr. Kaul's lack of insurance, implicated the doctrine of informed consent.[6] All of the claims asserted by plaintiffs against Dr. Kaul, other than the medical malpractice

---

[6] In Count Two, plaintiffs alleged that Dr. Kaul misrepresented his professional training and experience.

21

claim asserted in Count One, were construed as direct claims under the statute cast in various guises against Dr. Kaul based on his lack of financial responsibility. As a result, neither the trial court nor the appellate panel considered whether the absence of statutorily required medical malpractice liability insurance may be information that a reasonably prudent patient would consider material to his or her decision to proceed with a course of medical treatment or surgical procedure.

Plaintiffs argue that the existence, or absence, of medical malpractice insurance is as important a piece of information as are the risks attendant to the medical treatment recommended by a physician. They insist that a discussion of the nature and risks of the treatment and the risks associated with failing to pursue a particular course of treatment is incomplete and any decision to pursue or reject a certain course of treatment cannot be considered informed if the physician fails to advise the patient that he does not possess the statutorily required medical malpractice insurance. Dr. Kaul responds that a physician's duty to obtain informed consent from a patient prior to undertaking medical treatment is limited to the risks associated with the treatment, not whether a patient may have a source to pay a monetary judgment in the event the physician negligently discharges his professional duties.

22

In Largey v. Rothman, 110 N.J. 204 (1988), the Court observed that the origins of the duty of a physician to obtain a patient's consent to a medical procedure can be traced to the eighteenth century. Id. at 207 (citing Slater v. Baker & Stapleton (1767), 95 Eng. Rep. 860 (K.B.)). In In re Conroy, 98 N.J. 321 (1985), this Court stated that "'[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault for which he is liable in damages.'" Id. at 346 (quoting Schloendorff v. Soc'y of N.Y. Hosp., 105 N.E. 92, 93 (N.Y. 1914)).

Informed consent is

> essentially a negligence concept, predicated on the duty of a physician to disclose to a patient such information as will enable the patient to make an evaluation of the nature of the treatment and of any attendant substantial risks, as well as of available options in the form of alternative therapies.

[Largey, supra, 110 N.J. at 208.]

If a physician withholds facts that are necessary to form the basis of an intelligent consent to proposed treatment, the physician has not discharged his duty to the patient. Ibid.; see Salgo v. Leland Stanford, Jr. Univ. Bd. of Trs., 317 P.2d 170, 181 (Cal. Ct. App. 1957). The duty extends to the need to provide information to a patient not only about risks attendant

23

to the proposed treatment but also to alternative treatments or therapies and the risks of pursuing no treatment at all. Matthies v. Mastromonaco, 160 N.J. 26, 38 (1999).

Largey, supra, adopted the "prudent patient" or "materiality of risk" standard. 110 N.J. at 213. The Court recognized that "[t]he foundation for the physician's duty to disclose in the first place is found in the idea that 'it is the prerogative of the patient, not the physician, to determine for himself the direction in which his interests seem to lie.'" Id. at 214 (quoting Canterbury v. Spence, 464 F.2d 772, 781 (D.C. Cir.), cert. denied, 409 U.S. 1064, 93 S. Ct. 560, 34 L. Ed. 2d 518 (1972)). Thus, this Court acknowledged a physician's duty to "'warn of the dangers lurking in the proposed treatment' and to 'impart information [that] the patient has every right to expect,' as well as a duty of 'reasonable disclosure of the choices with respect to proposed therapy and the dangers inherently and potentially involved.'" Id. at 211 (alteration in original) (quoting Canterbury, supra, 464 F.2d at 782). The Court stated that

> the scope of the duty to disclose "must be measured by the patient's need, and that need is the information material to the decision. Thus the test for determining whether a particular peril must be divulged is its materiality to the patient's decision: all risks potentially affecting the decision must be unmasked. And to safeguard the patient's interest in achieving his own determination on

24

treatment, the law must itself set the standard for adequate disclosure."

> [Ibid. (quoting Canterbury, supra, 464 F.2d at 786-87).]

The breadth of the duty to disclose risks is measured by a standard that is not personal to the physician or to the patient. Rather, it is an objective standard "'with due regard for the patient's informational needs and with suitable leeway for the physician's situation.'" Ibid. (quoting Canterbury, supra, 464 F.2d at 787). A risk is "material" if the reasonable patient "would be 'likely to attach significance to the risk or cluster of risks' in deciding whether to forego the proposed therapy or to submit to it." Id. at 211-12 (quoting Canterbury, supra, 464 F.2d at 787).

Thus, the Largey Court reversed the verdict in favor of a physician, where the trial court instructed the jury to evaluate the plaintiff's informed consent claim in accordance with the prevailing "reasonable physician" standard. Id. at 205, 216. In the course of deciding that the plaintiff's informed consent claim should be evaluated in accordance with the prudent patient standard, the Court stated that

> "[t]he topics importantly demanding a communication of information are the inherent and potential hazards of the proposed treatment, the alternatives to that treatment, if any, and the results likely if the patient remains untreated. The factors contributing significance to the dangerousness of a medical

25

technique are, of course, the incidence of injury and the degree of harm threatened."

[Id. at 213 (alteration in original) (quoting Canterbury, supra, 464 F.2d at 787-88).]

In Matthies, supra, the Court emphasized that a physician is required to explain the risks associated with all medically reasonable alternatives, including invasive and noninvasive treatments. 160 N.J. at 34. In that case, an eighty-one-year-old, partially paralyzed woman living independently fell and fractured her hip. Id. at 29-30. Without consulting the patient or her family, her physician unilaterally decided not to surgically repair her fractured hip and placed her on bed rest. Id. at 31. The Court emphasized that "the decisive factor [in any informed consent analysis] is not whether a treatment alternative is invasive or noninvasive, but whether the physician adequately presents the material facts so that the patient can make an informed decision." Id. at 36. Dismissing the contention that the plaintiff's position would require a physician to provide a detailed explanation of every treatment option, the Court emphasized that "[t]he standard obligates the physician to disclose only that information material to a reasonable patient's informed decision." Ibid. (citing Largey, supra, 110 N.J. at 211-12). Because the physician impermissibly arrogated to himself the decision concerning which treatment

26

alternative would be pursued, the Court remanded the matter for a new trial.  Id. at 34, 41.

The validity of the consent obtained from a patient normally is confined to a disclosure of the risks associated with the recommended procedure and alternative procedures or therapies.  The Court has recognized, however, that in certain circumstances consent may be vitiated if the physician made significant misrepresentations of his credentials or experience.  In Howard, supra, a neurologist disclosed to the plaintiff the significant risks, including paralysis, of the surgery proposed to address a large cervical disc herniation.  172 N.J. at 543.  The plaintiff claimed that the defendant physician informed him that he was a board certified physician and in each of the prior eleven years had performed sixty procedures similar to the procedure he proposed to perform on the plaintiff.  Ibid.  Following the surgery, which left the plaintiff a quadriplegic, the plaintiff learned that the defendant neurologist was not board certified and had performed the procedure no more than twenty-five times.  Id. at 544.

The Court acknowledged in Howard that a misrepresentation about a physician's credentials or experience is "not a perfect fit" with the prevailing doctrine of informed consent.  Id. at 557.  Nevertheless, the Court determined that "the possibility of materiality is present" when the physician makes significant

27

misrepresentations about his credentials and experience when discussing the risks associated with the proposed surgical procedure, and those misrepresentations may undermine the validity of the consent obtained from the patient. Id. at 558. The Court stated that

> [i]n certain circumstances, a serious misrepresentation concerning the quality or extent of a physician's professional experience, viewed from the perspective of the reasonably prudent patient assessing the risks attendant to a medical procedure, can be material to the grant of intelligent and informed consent to the procedure.
>
> [Id. at 555 (citing 1 Dan B. Dobbs, The Law of Torts, § 251 at 660-61 (2001)).]

Thus, to succeed on an informed consent claim based on misrepresented credentials and experience, the plaintiff in Howard also was required to show that the additional risk posed by the physician's actual credentials and experience increased the plaintiff's risk of paralysis from the procedure. Id. at 558. That demonstration is guided by two inquiries: first, "whether the more limited experience or credentials possessed by defendant [physician] could have substantially increased plaintiff's risk of paralysis," ibid., and second, "whether that substantially increased risk would cause a reasonably prudent person not to consent to undergo the procedure," ibid.

Requiring a physician to disclose whether he maintains medical malpractice liability insurance, the amount of the

28

coverage, and any restrictions, reservations, or limitations of the insurance coverage, or whether a physician has posted a letter of credit with the BME is also "not a perfect fit" with our informed consent jurisprudence.

We recognize that the existence or not of medical malpractice liability insurance or the permissible letter of credit may be material information for some patients. To encourage compliance and to enforce the legislative mandate, the BME has adopted regulations that declare that the failure to obtain and maintain medical malpractice liability insurance constitutes professional misconduct. N.J.A.C. 13:35-6.18(e). In addition, a physician's failure to have the required coverage subjects him or her to discipline in accordance with N.J.S.A. 45:9-19.17(b), which may include revocation or suspension of the physician's license to practice medicine in this State. See N.J.S.A. 45:1-21.

Declaring that failure to comply with the statutory requirement to maintain liability insurance is an act of professional misconduct, which subjects a physician to substantial discipline by the BME, and recognizing that some patients would consider the existence or not of such insurance material information do not lead inexorably to the conclusion that noncompliance with the statutory mandate should give rise to an informed consent claim. As explained in Largey, supra,

29

informed consent is predicated on the duty of the physician to disclose to the patient the information that will enable the patient to make a reasoned evaluation of the nature of the proposed treatment, any risks associated with it, and those risks associated with any alternative treatments. 110 N.J. at 208. Yet, there may be many reasons that explain a physician's lack of liability insurance and some of those reasons do not necessarily mean that the physician is unskilled to perform the proposed procedure or to administer the proposed treatment.[7] In such circumstances, the absence of insurance bears no relation to the nature of the proposed medical course or to the risks attendant to a proposed procedure or treatment.

To be sure, a patient who has been injured due to negligent care by an uninsured physician has sustained a financial loss, but such a loss is not the injury that the informed consent doctrine ever contemplated. Applying the informed consent jurisprudence to the financial consequences of negligent care by an uninsured physician untethers the remedy from its theoretical underpinnings and is a stark departure from our prior

---

[7] We readily acknowledge in Howard, supra, that even exaggerating one's credentials was "not a perfect fit" with our informed consent jurisprudence. 172 N.J. at 557. Nevertheless, we permitted a plaintiff to proceed with such a claim if he could establish that the actual experience of the physician "could have substantially increased plaintiff's risk of paralysis" and that a patient facing that increased risk would not consent to the procedure. Id. at 558.

jurisprudence.  We discern no principled reason to extend the additional and questionable relief that the informed consent doctrine may provide to an injured patient to address the financial insecurity of a physician.

VII.

Plaintiffs also asserted a negligence claim against MSSC based on its action permitting Dr. Kaul to perform a medical procedure for which he was uninsured at its facility. Plaintiffs do not seek to hold MSSC vicariously liable for Dr. Kaul's negligent treatment.  Rather, they contend that MSSC owed a duty to them and others to limit use of its facility only to those who satisfy the statutory mandate to obtain and maintain the minimum level of medical malpractice liability insurance. In essence, plaintiffs asserted a claim of negligent hiring against MSSC.

Generally, a person who engages an independent contractor is not liable for the negligence of that contractor.  Majestic Realty Assocs. v. Toti Contracting Co., 30 N.J. 425, 430-31 (1959).  An individual will be held liable if he or she: (1) retains control of the manner and means by which the work will be performed; (2) retains an incompetent contractor; or (3) retains an independent contractor to perform work that constitutes a nuisance per se.  Ibid.  Plaintiffs urge that a surgical center that grants privileges to a physician to perform

31

a procedure for which he is uninsured invokes the second exception because it permitted an incompetent physician to use its facility.

The incompetent contractor exception is founded on the premise that

> [a]n employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor
>
> (a) to do work which will involve the risk of physical harm unless it is skillfully and carefully done, or
>
> (b) to perform any duty which the employer owes to third persons.
>
> [Restatement (Second) of Torts § 411 (1965).]

A competent and careful contractor is "a contractor who possesses the knowledge, skill, experience, and available equipment which a reasonable [person] would realize that a contractor must have in order to do the work which he is employed to do without creating unreasonable risk of injury to others." Id. at cmt. (a). Any liability for failing to engage a competent contractor is limited "to the physical harm as is so caused." Id. at cmt. (b). In order for the employer to be liable, "that harm shall result from some quality in the contractor which made it negligent for the employer to entrust the work to him." Ibid.

32

Efforts to invoke the second Majestic exception to the ordinary rule that a principal is not liable for the negligent acts of an independent contractor have often arisen in the context of a tradesman, such as a paver, a tree surgeon, or a carpenter, who was employed to perform a certain task and is later determined to be insolvent. See Mavrikidis v. Petullo, 153 N.J. 117, 137-38 (1998) (rejecting contention that efforts to minimize cost and use of uninspected truck constitutes incompetence); Cassano v. Aschoff, 226 N.J. Super. 110, 112, 116 (App. Div.) (rejecting contention that insolvency of tree surgeon constitutes indicia of incompetence), certif. denied, 113 N.J. 371 (1988); Miltz v. Borroughs-Shelving, 203 N.J. Super. 451, 466 (App. Div. 1985) (confirming that financial responsibility is not reliable indicia of incompetence of carpenter). In those cases, lack of financial responsibility, including the absence of insurance, was not considered as indicia of a lack of skill or incompetence. Such dispositions are consistent with comment (g) to § 411 of the Restatement, which provides that § 411 "has no application where the contractor, although competent and careful, is financially irresponsible."

Mavrikidis illustrates this rule and comment. In Mavrikidis, a trucking firm retained by a gasoline station operator to pave the surface of the station used a grossly

33

overloaded truck with faulty brakes to haul hot asphalt to the gas station. 153 N.J. at 124-25, 128. Unable to stop due to the faulty brakes, the truck drove through a red light, struck the plaintiff's car, hit a telephone pole and overturned, spilling hot asphalt onto the plaintiff's car. Id. at 125. The Court refused to recognize a cause of action for negligent hiring of the asphalt hauler because the evidence presented at trial demonstrated that the retained contractor was a skilled and experienced paving contractor and there was no evidence that the gas station operator knew or had reason to know that the vehicle used to carry the asphalt was unsafe. Id. at 141-42. In a dissenting opinion, Justice Stein asserted that the majority viewed the Majestic incompetent contractor exception too narrowly. Id. at 152 (Stein, J., dissenting). The dissent also found substantial evidence to support the jury's finding that the gas station operator negligently hired a contractor to pave and transport hot asphalt because it could set off the paving cost against a debt owed to it by the contractor, and it knew that the contractor operated uninspected trucks in a state of disrepair. Id. at 154-58.

In Puckrein v. ATI Transport, Inc., 186 N.J. 563, 579-80 (2006), the Court addressed the Majestic negligent hiring exception in the context of retaining independent contractors to perform tasks in a highly regulated industry. We recognized a

34

cause of action against a principal engaged in the collection and disposal of solid waste and recyclable materials, who retained a trucking company to haul the waste to various out-of-state waste disposal facilities.  The principal demonstrated little or no regard for the qualifications of the drivers or the conditions of the vehicles used to transport the materials.  The contract between the business and the trucking firm retained by it required the trucking firm to comply with all applicable city, state, and federal requirements, and the trucking firm agreed to maintain required insurance and to indemnify the business that retained its services.  Id. at 569-70.

Discovery revealed that equipment bearing markings other than the retained trucking firm occasionally appeared at the facility to collect solid waste and recyclable materials.  Id. at 571.  The transportation manager for the principal believed "they were the same company."  Ibid.  Moreover, the transportation manager conceded that he never checked to determine if the trucks that appeared at his facility had passed inspection or held the requisite registration, insurance, licenses, or permits.  Ibid.

The incident that formed the basis for the plaintiff's complaint in Puckrein occurred when the driver of a tractor-trailer drove through a red light and struck an automobile with three occupants.  Id. at 568.  Two of the occupants died; a

35

third occupant was seriously injured.  Ibid.  At the time of the accident, the tractor-trailer contained tons of glass residue.  Ibid.  The vehicle also had faulty brakes and the liability insurance had lapsed.  Id. at 568, 570.

Relying on basic negligence principles and § 411 of the Restatement, the Court recognized a duty of an employer "to exercise reasonable care to employ a competent and careful contractor" to perform work that involves a risk of physical harm unless it is done with skill.  Id. at 575.  The Court concluded that

> to prevail against the principal for hiring an incompetent contractor, a plaintiff must show that the contractor was, in fact, incompetent or unskilled to perform the job for which he/she was hired, that the harm that resulted arose out of that incompetence, and that the principal knew or should have known of the incompetence.
>
> [Id. at 576 (citing Mavrikidis, supra, 153 N.J. at 136-37).]

In so holding, the Court addressed the contrary result reached in Mavrikidis.

The Puckrein Court did not view its earlier opinion in Mavrikidis as the final word on the Majestic incompetent contractor exception; instead, the Court viewed the disposition in Mavrikidis as

> a difference of opinion over whether to consider that contract narrowly as a paving contract, or more broadly as including pre-

36

and post-paving activities. Although that issue may be debatable, what is not debatable is that the tipping point between the majority and the dissent in Mavrikidis was not a disagreement over the basic legal principles to which we have adverted. That is the backdrop for our inquiry.

[Id. at 577.]

Ultimately, the Puckrein Court determined that summary judgment had been improperly granted in favor of the business that had retained the wastehauler. Id. at 580. The Court noted that the tractor-trailer operator hauling the glass had been retained to perform the very task that was the subject of the contract between the business and the wastehauler. Id. at 578. Any driver performing those tasks had to have a valid driver's license, the vehicle had to be registered and inspected, and the owner/operator of the vehicle had to maintain liability insurance. Ibid. As such, the Court concluded that

> the core question here is not whether [the retained trucker] was competent to transport [the business's] loads upon the public highways -- it was not. The question is whether [the business] violated its duty to use reasonable care in selecting a trucker and whether it knew or should have known of [the retained trucker's] incompetence.

[Id. at 579.]

A later case rephrased the essential question as whether the principal that engaged an independent contractor inquired "into

37

an independent contractor's essential competency."  Fox v. Millman, 210 N.J. 401, 427 (2012).

A year following this Court's decision in Puckrein, the Court restated the circumstances that would permit a person to prevail on a claim against a principal who retained an incompetent or unskilled contractor.  Basil, supra, 193 N.J. at 68.  In Basil, this Court addressed a negligent hiring claim brought against a workers' compensation carrier that retained an uninsured physician to examine and treat persons who sustained workplace injuries.  Id. at 43-45.  The physician was not obliged to have medical malpractice liability insurance as a condition of his license to practice medicine in this State at the time the insurance carrier retained the defendant physician or at the time he performed the medical examinations of the plaintiff.  Id. at 72.  Accordingly, the Court concluded that the physician could not be considered an incompetent contractor.  Id. at 72-73.

The Court proceeded, however, to emphasize that the current state of the law requiring medical malpractice liability insurance as a condition of licensure imposed a continuing responsibility on an insurer that retains physicians to treat or examine injured workers to ensure that the retained physician is qualified to practice.  Id. at 73.  The Court stated:

> State regulations now clearly require practicing physicians maintaining a professional office . . . to obtain a minimum amount of medical malpractice insurance as a condition for licensure. An IME contract physician who lacked malpractice insurance <u>after</u> . . . (the effective date of [<u>N.J.A.C.</u> 13:35-6.18(a)]), is unqualified to practice medicine. Consistent with our 2006 holding in <u>Puckrein</u>, <u>supra</u>, an insurance company that engages an IME physician for evaluative purposes now must be aware that it is under a continuing duty of inquiry in respect of malpractice insurance requirements in order to ensure that the physicians it engages are qualified to practice.
>
> [<u>Ibid.</u> (internal citation omitted).]

In sum, <u>Puckrein</u> establishes that, when a business retains a contractor to perform a task that requires special skill and specific permits or licenses, its retention of a contractor without those necessary credentials subjects the business to liability for hiring an incompetent contractor. Similarly, <u>Basil</u> counsels that granting privileges to a physician without the appropriate credentials also exposes the health care facility to liability for hiring an incompetent contractor.

The provision of medical care is highly regulated in this State. Hospitals and the wide variety of alternative providers of health care services, including ambulatory care centers and surgical centers, are highly regulated. <u>See, e.g.,</u> <u>N.J.A.C.</u> 8:43G-1.1 to -7A.10 (establishing hospital licensing standards); <u>N.J.A.C.</u> 8:43A-1.1 to -33.4 (promulgating manual of standards

39

for licensing ambulatory care centers).  No health care facility may provide medical care unless it obtains a license, N.J.S.A. 26:21-1 to -12(a), and that license is subject to renewal on an annual basis, N.J.A.C. 8:43E-5.3(c).  Each set of regulations governing each type of health care facility recognizes that the health care administered in a facility is provided by employees, such as nurses and technicians, and independent contractors, such as physicians.  Health care facilities are given broad responsibility to select the professionals who will provide medical care; however, regulations address the manner in which the medical staff shall be organized, the staff policies and procedures that should be addressed, and medical staff qualifications.  N.J.A.C. 8:43G-16.1 to -17.1.  The governing authority of each facility is required to establish criteria for delineating the privileges that will be granted, granting privileges to provide medical care in its facility in accordance with the adopted standards and procedures, and reviewing the granted privileges on a periodic basis.  N.J.A.C. 8:43A-4.1, -7.2 to -7.4.  Physicians must submit an application to obtain privileges and must demonstrate that they are currently licensed to practice medicine in this State.  See N.J.A.C. 8:43A-1.21, -3.5, and -12.3(a) (requiring provision of surgical privileges at ambulatory health centers to currently licensed physicians); N.J.A.C. 8:43G-16.3(a) (requiring all physicians

40

with clinical privileges at hospitals to be licensed to practice medicine by BME). Obtaining and maintaining medical malpractice liability insurance in the amounts prescribed by law is a requirement to obtain and maintain a license to practice medicine in New Jersey. N.J.S.A. 45:9-19.17; N.J.A.C. 13:35-6.18(b).

In the context of plaintiffs' negligent hiring claim against MSSC, the basic element of competency for any physician seeking surgical privileges at MSSC's facility is possession of a license to practice medicine in the State of New Jersey. An essential condition for such a license is possession of a policy of medical malpractice liability insurance or an acceptable letter of credit as required by statute and the regulations adopted by the BME. Moreover, the statutory financial responsibility requirements impose a continuing obligation on the physician to maintain the appropriate type and amount of insurance.

As recognized in Puckrein and Basil, when the task that a principal retains an independent contractor to perform requires specific qualifications, such as possession of certain permits and licenses, the principal has an initial duty to ascertain that the contractor possesses the requisite license and a continuing duty to assure that the requisite license is maintained. Here, MSSC had a duty to withhold privileges to any

41

physician who did not meet the financial responsibility requirements for a license to practice medicine in this State. To be sure, the Legislature delegated the authority to enforce the liability insurance requirement to the BME. The record before the trial court, however, demonstrates that MSSC knew that Dr. Kaul possessed an insurance policy that expressly excluded the procedure performed on plaintiff. The record also reveals that Dr. Kaul asserted that he advised the BME and MSSC that he possessed sufficient assets to satisfy the alternative letter of credit requirement. Yet, a simple representation that a physician possesses sufficient assets does not satisfy the regulatory definition of a letter of credit. See N.J.A.C. 13:35-6.18(a). More importantly, the record is barren of any evidence that the BME accepted this bare representation of financial responsibility or that MSSC conducted any inquiry to confirm that the BME deemed such a representation as compliance with the statutory insurance requirement. In short, based on this record, the trial court erred in granting summary judgment in favor of MSSC.

A negligent hiring cause of action is not a strict liability claim. To the contrary, it is founded on basic negligence principles. Thus, a plaintiff who asserts such a claim against a health care facility must do more than prove that the facility granted privileges to a physician without the

42

statutorily required medical malpractice liability insurance or letter of credit.

Here, having misconstrued the nature of plaintiffs' claim against MSSC, the trial court dismissed the negligent hiring claim. As noted in this opinion, there are several open questions about whether Dr. Kaul complied with the alternative letter of credit requirement. As described by Dr. Kaul, his bare assertion of adequate financial assets to respond to a negligence claim does not comply with the BME definition of a letter of credit. N.J.A.C. 13:35-6.18(a). Moreover, Dr. Kaul asserts either he or MSSC personnel discussed the sufficiency of his purported letter of credit with BME personnel. Discovery is required to clarify this and other issues integral to this claim. We therefore reverse the summary judgment entered in favor of MSSC in the negligent hiring claim asserted by plaintiffs.

## VIII.

In summary, we conclude that N.J.S.A. 45:9-19.17 does not create a direct action by an injured patient against a physician who does not possess medical malpractice liability insurance or a suitable letter of credit. Moreover, failure to comply with the statutory liability insurance mandate does not give rise to an informed consent claim. The inability to recover a judgment is not the injury contemplated by the informed consent doctrine.

43

Finally, we hold that a cause of action for negligent hiring may be asserted against a health care facility that grants privileges to a physician who has not complied with the statutorily required insurance.  A health care facility that grants privileges to physicians to use its facility has a continuing duty to ensure that any physician granted privileges maintains the required insurance, which is a condition of obtaining and maintaining a license to practice medicine in this State.

IX.

The judgment of the Appellate Division is affirmed in part and reversed in part and remanded for further proceedings consistent with this opinion.


JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUDGE CUFF's opinion.  JUSTICE ALBIN filed a separate opinion dissenting in part and concurring in part, in which CHIEF JUSTICE RABNER joins.

44

JAMES R. JARRELL and SHEILA
G. JARRELL, his wife,

    Plaintiffs-Appellants,

        v.

RICHARD A. KAUL, M.D. and
MARKET STREET SURGICAL
CENTER,

    Defendants-Respondents,

        and

JOHN T. FORD, SUSSEX COUNTY
TOTAL HEALTH CENTER, INC.,

    Defendants.


    JUSTICE ALBIN, dissenting and concurring.

    The facts here present the quintessential case of lack of informed consent. Dr. Kaul did not have the medical malpractice insurance required by law to perform the invasive surgical procedure on his patient, plaintiff James Jarrell. Performing the procedure without the requisite insurance constituted professional misconduct. Yet, Dr. Kaul never explained any of this to his patient, presumably because plaintiff never would have agreed to the procedure had he been fully informed.

    Dr. Kaul failed to disclose material facts to his patient. He denied plaintiff the right to decide whether a financially

1

incompetent -- or worse yet, a professionally incompetent -- physician should perform invasive surgery on him. Dr. Kaul was credentialed only as an anesthesiologist; he was not insured to perform spinal surgery.

A logical extension of our informed-consent jurisprudence would permit a cause of action if a plaintiff can establish four elements: (1) the physician was uninsured to perform the medical procedure, (2) the physician failed to inform the patient that he was uninsured, (3) the patient would not have undergone the procedure if properly informed, and (4) the plaintiff can prove damages. The majority, however, is not willing to take this natural step in the development of our common law.

A cause of action for lack of informed consent would recognize that a physician cannot hide material facts and that the patient has a right to make critical choices concerning his health. No reasonable patient would consent to spinal surgery knowing that his physician lacks malpractice insurance to perform that procedure. Because the majority is unwilling to find that Dr. Kaul breached a common-law duty by failing to disclose to the patient his lack of insurance to perform spinal surgery, I respectfully dissent. I concur in the remainder of the Court's opinion.

I.

2

A physician is statutorily required to maintain medical malpractice liability insurance.  N.J.S.A. 45:9-19.17.  The purpose of the law is "to ensure the citizens of the State that they will have some recourse for adequate compensation in the event that a physician or podiatrist is found responsible for acts of malpractice."  Assembly Health Comm., Statement to S. 267 (Sept. 19, 1996).  A physician who does not maintain medical malpractice liability insurance for a procedure he performs is subject to discipline for professional misconduct -- discipline that includes possible revocation or suspension of his license to practice medicine.  See N.J.S.A. 45:1-21; N.J.A.C. 13:35-6.18(e).  The public therefore presumes that a physician is insured to perform a surgical procedure.

Physicians are obligated to provide information that is material to a reasonable patient's ability to make an informed decision about whether to proceed with a course of treatment or procedure.  Matthies v. Mastromonaco, 160 N.J. 26, 36 (1999).  The doctrine of informed consent finds its source in the concept of negligence.  Largey v. Rothman, 110 N.J. 204, 208 (1988).  In an informed-consent analysis, the dominant issue is "whether the physician adequately presents the material facts so that the patient can make an informed decision."  Matthies, supra, 160 N.J. at 36.  A "'physician violates his duty to his patient and subjects himself to liability if he withholds any facts which

3

are necessary to form the basis of an intelligent consent by the patient to the proposed treatment.'" Largey, supra, 110 N.J. at 208 (quoting Salgo v. Leland Stanford, Jr. Univ. Bd. of Trustees, 317 P.2d 170, 181 (Cal. Dist. Ct. App. 1957)); see also In re Conroy, 98 N.J. 321, 346 (1985) (explaining that under informed-consent doctrine, "no medical procedure may be performed without a patient's consent, obtained after explanation of the nature of the treatment, substantial risks, and alternative therapies" (internal quotation marks omitted)). The informed-consent doctrine is about patient autonomy -- the right of the patient to make decisions that intimately and materially concern his health and life. Rothman, supra, 110 N.J. at 209; see also Howard v. Univ. of Med. & Dentistry of N.J., 172 N.J. 537, 557 (2002) (recognizing informed-consent claim when objectively reasonable patient would not consent to procedure if physician's inexperience had been known to patient). The physician cannot arrogate to himself decisions that vitally concern the patient's health.

A patient has a right to know whether a physician performing a procedure is in a financially responsible position in the event that the patient suffers injuries due to medical malpractice. A reasonable patient would consider a physician's lack of insurance a material factor in making a decision whether to have spinal surgery. That is so because an uninsured

4

physician provides no financial safety net for a patient who is harmed by the physician. Lack of insurance also may suggest that the carrier considered the physician incompetent to perform the procedure.

If the physician does not tell the patient that he is not lawfully permitted to perform the uninsured medical procedure, then the patient should be able to file a cause of action for lack of informed consent, provided he would not have undergone the procedure had he been properly informed and he can prove damages.

## II.

The goals of tort law are to deter persons from engaging in unreasonable conduct and to compensate victims for the damage done to them by tortfeasors. The application of the common law to this claim of lack of informed consent would have been an unremarkable extension of our jurisprudence. It is remarkable that a patient has no cause of action against a physician who performs a surgical procedure under the false pretense that he is insured.

For those reasons, I respectfully dissent in part and concur in part.

SUPREME COURT OF NEW JERSEY

NO.    A-42                              SEPTEMBER TERM 2013

ON CERTIFICATION TO     Appellate Division, Superior Court


JAMES R. JARRELL and SHEILA
G. JARRELL, his wife,

     Plaintiffs-Appellants,

         v.

RICHARD A. KAUL, M.D. and
MARKET STREET SURGICAL
CENTER,

     Defendants-Respondents,

        and

JOHN T. FORD, SUSSEX COUNTY
TOTAL HEALTH CENTER, INC.,

     Defendants.


DECIDED          September 29, 2015
                 Chief Justice Rabner          PRESIDING
OPINION BY          Judge Cuff (temporarily assigned)
CONCURRING/DISSENTING OPINIONS BY     Justice Albin
DISSENTING OPINION BY

| CHECKLIST | AFFIRM IN PART/ REVERSE IN PART/ REMAND | CONCUR IN PART/ DISSENT IN PART |
|---|---|---|
| CHIEF JUSTICE RABNER | | X |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | | X |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | X | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 5 | 2 |